## JEAN T. ROBINSON *v.* UNEMPLOYMENT SECURITY BOARD OF REVIEW ET AL.

COTTER, C. J., LOISELLE, BOGDANSKI, PETERS and HEALEY, Js.

Argued February 5—decision released May 27, 1980

1

*Paul E. Knag,* with whom were *Richard W. Rutherford* and, on the brief, *John F. Spindler* and *Clifford R. Oviatt,* for the appellant (defendant W. Whitney Stueck, Inc.).

*Donald E. Wasik,* assistant attorney general, with whom, on the brief, was *Carl R. Ajello,* attorney general, for the appellee (named defendant).

COTTER, C. J. This is an appeal from a judgment of the Superior Court affirming a grant of unemployment compensation benefits to the plaintiff, Jean T. Robinson, a former employee of the defendant W. Whitney Stueck, Inc. The facts found by the employment security appeals referee, which are not disputed, reveal that the plaintiff was employed for twelve years by W. Whitney Stueck, Inc., as a secretary-bookkeeper. After giving notice, she voluntarily terminated her employment on December 29, 1977, to accompany her husband to the state of Georgia, where he had been transferred by his employer. After arriving in Georgia, the plaintiff filed successfully for unemployment compensation benefits from the Connecticut unemployment compensation fund.

The employment security administrative appellate system established pursuant to General Statutes § 31-237b provides for an employment security board of review and a referee section which are separate and apart from the administrator of the unemployment act. The appeals referee in this case sustained the award of benefits, and the defendant board of review adopted its findings, affirmed the referee's decision and dismissed the employer's appeal. From the dismissal the employer, W. Whitney Stueck, Inc., appealed unsuccessfully to the

Superior Court. See General Statutes § 31-249b. This court granted certification pursuant to General Statutes § 51-197b.

The plaintiff's eligibility to receive unemployment compensation benefits is governed by General Statutes § 31-236 (2) (a). Section 31-236, which was amended by Public Acts 1977, No. 77-323, provides in pertinent part: "An individual shall be ineligible for benefits . . . (2) (a) if, in the opinion of the administrator, he has left suitable work voluntarily and without sufficient cause connected with his work, provided no individual shall be ineligible for benefits if he leaves suitable work for cause, including leaving as a result of changes in conditions created by his employer, or until such individual has earned at least ten times his benefit rate . . . ." Prior to the passage of Public Act No. 77-323, § 31-236 (2) (a), popularly known as Connecticut's "quits" law, provided in relevant part that an individual shall be ineligible for benefits: "during the week in which, in the opinion of the administrator, he has left suitable work voluntarily and without sufficient cause connected with his work . . . and for the next four following weeks . . . ." Therefore, under Connecticut's "quits" law prior to 1977, if no job related reason existed, a claimant was disqualified from receiving benefits regardless of how meritorious a personal reason he might have had for leaving but the extent of disqualification was limited to a four week waiting period after the week the claimant left work. *Schettino* v. *Administrator,* 138 Conn. 253, 258, 83 A.2d 217; *Consiglio* v. *Administrator,* 137 Conn. 693, 696, 81 A.2d 351; *Wyka* v. *Colt's Patent Fire Arms Mfg. Co.,* 129 Conn. 71, 73–74, 26 A.2d 465.

The sole issue before this court, as a matter of first impression, is whether the 1977 amendment to Connecticut's "quits" law requires that a claimant be disqualified from receiving unemployment compensation benefits for voluntarily leaving a suitable job for a personal reason such as, in this case, accompanying her husband out of state because of a transfer of his job. In other words, as a threshold matter, does eligibility for unemployment compensation under the present § 31-236 (2) (a) of necessity depend upon an individual's quitting "for cause" related to his or her work.

In affirming the plaintiff's award of benefits, the appeals referee ruled that a voluntary departure from suitable work to accompany a spouse who accepted a job transfer was sufficient cause, under § 31-236 (2) (a), for eligibility inasmuch as there was no evidence of any other reasonable alternative measure available to the plaintiff. The board of review concluded that the appeals referee's determination—that the non-work-connected reason the plaintiff left her job was of such a nature as to be "for cause" within the intention of § 31-236 (2) (a) —was supported by the referee's findings of fact and legally consistent with those findings.

In appeals of this nature, the Superior Court does not try the matter de novo. It is bound by the findings of subordinate facts and the reasonable conclusions of fact made by the appeals referee, where, as is true here, the board of review adopted the findings and affirmed the decision of the referee. *Oppenheimer* v. *Administrator,* 177 Conn. 593, 596, 419 A.2d 337; *Cervantes* v. *Administrator,* 177 Conn. 132, 134, 411 A.2d 921; *DaSilva* v. *Administrator,*

175 Conn. 562, 564, 402 A.2d 755; *Guevara* v. *Administrator,* 172 Conn. 492, 495, 374 A.2d 1101; *Bartlett* v. *Administrator,* 142 Conn. 497, 505, 115 A.2d 671. The court's function is to determine, on the record, whether the referee acted unreasonably, arbitrarily or illegally.[1] Conclusions of law reached by the referee must stand if they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. *DaSilva* v. *Administrator,* supra; *Guevara* v. *Administrator,* supra.

---

[1] In its brief, and on oral argument, the defendant employer sought to place before this court the issue of whether the award of benefits to the plaintiff was made pursuant to an invalid regulation issued by the administrator. This issue is not properly before us. The defendant claims that the department of labor, whose commissioner is the administrator of unemployment compensation; General Statutes § 31-222 (c); issued a policy letter which was relied on by the administrator, the appeals referee, and the board of review in granting the plaintiff's application for unemployment compensation benefits. This policy letter which the defendant claims had the effect of a regulation was thus allegedly invalid because it was not promulgated in accordance with the pertinent provisions of the Uniform Administrative Procedures Act. See General Statutes §§ 4-166–4-173 and 4-185.

As we have noted, however, the board of review is a statutory entity separate and apart from the administrator; General Statutes §§ 31-237a–31-237g; and it is the basis of the review board's determination not that of the administrator that is at issue on this appeal. Furthermore, there is nothing in the record of either the appeals referee's decision or the review board's decision which indicates that either relied on a policy letter of the administrator, to which, in any event, neither would be bound. Thus, the present case is clearly distinguishable from the only decision of this court that the defendant relies on, *Salmon Brook Convalescent Home, Inc.* v. *Commission on Hospitals and Health Care,* 177 Conn. 356, 417 A.2d 358. In *Salmon Brook,* supra, the defendant commission approved the report of its hearing panel and adopted the proposed findings and order as its own finding and order. The hearing panel had explicitly in its decision relied on rate-setting guidelines issued by the commission itself. This court invalidated the defendant-commission's decision as ultimately based on its own illegally promulgated regulation, albeit labeled "guidelines." Id., 356–68.

6

Since statutory interpretation presents a question of law; *Pascale* v. *Board of Zoning Appeals,* 150 Conn. 113, 116, 186 A.2d 377; as a preliminary step in determining whether the Superior Court erred in deciding that the appeals referee's conclusion must stand, we note that a cardinal rule of statutory construction is that statutes are to be construed to give effect to the apparent intention of the law-making body. *Farms Country Club, Inc.* v. *Carini,* 172 Conn. 439, 444, 374 A.2d 1094; *Jarvis Acres, Inc.* v. *Zoning Commission,* 163 Conn. 41, 46, 301 A.2d 244; *McAdams* v. *Barbieri,* 143 Conn. 405, 416, 123 A.2d 182; 2A Sutherland, Statutory Construction (4th Ed.) § 45.05. If the language of the statute is clear, it is assumed that the intention is expressed by the words themselves and therefore there is no need to construe the statute; *Anderson* v. *Ludgin,* 175 Conn. 545, 552, 400 A.2d 712; for where the wording is plain, courts will not speculate as to any supposed intention because the question before a court then is not what the legislature actually intended but what intention it expressed by the words that it used. *Doe* v. *Institute of Living, Inc.,* 175 Conn. 49, 68, 392 A.2d 491; *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154.

We do not find the language at issue in § 31-236 (2) (a) to be clear on its face. The threshold question of whether the words "for cause" in the proviso added to former § 31-236 (2) (a) by Public Act No. 77-323 encompass work-related cause cannot be resolved readily or with certainty from the language of § 31-236 (2) (a) alone.[2] The statute does not pro-

---

[2] The pertinent part of § 31-236 is repeated here for convenience. "An individual shall be ineligible for benefits . . . (2) (a) if, in the opinion of the administrator, he has left suitable work voluntarily and without sufficient cause connected with his work, provided no

vide a definition of the words "for cause." Further, consideration of the general principle that a statutory term is to be given the meaning it has "according to the commonly approved usage of the language"; General Statutes § 1-1 (a); *Connecticut Light & Power Co.* v. *Costle,* 179 Conn. 415, 423, 426 A.2d 1324; *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 134, 355 A.2d 236; is not helpful within the framework of the circumstances of this case. The ordinary and customary meaning of the phrase "for cause" is "[for] a good or adequate reason"; Webster, Third New International Dictionary; in the context of § 31-236 (2) (a), this definition does not elucidate whether a good or adequate reason need be one that is work-related.

Moreover, the lack of clarity of § 31-236 (2) (a) on its face in regard to the question of whether "for cause" means work-connected cause is clearly illustrated by the problems created by construing the phrase in either manner. On the one hand, if the proviso added by Public Act No. 77-323 is construed to mean "for cause which need not be related to employment," then the effect of the proviso on the general rule that precedes it in § 31-236 (2) (a) would be to eliminate the need for and make superfluous the phrase "connected with his work." This would violate the principle that, if possible, a statute should be construed so that no word, phrase, or clause will be rendered insignificant. *Connecticut Light & Power Co.* v. *Costle,* supra; *State ex rel. Kennedy* v. *Frauwirth,* 167 Conn. 165, 168, 355 A.2d

individual shall be ineligible for benefits if he leaves suitable work for cause, including leaving as a result of changes in conditions created by his employer, or until such individual has earned at least ten times his benefit rate . . . ."

39. This same principle would be violated, however, if the phrase "for cause" were construed in the opposite manner, as for work-related cause, because a repetitious construction would result which would make the phrase "for cause" itself superfluous.

Thus, since the meaning of the phrase "for cause" in § 31-236 (2) (a) cannot be deemed clear on the face of the statute, the provision must be construed by this court and it is well settled that such construction must be undertaken in light of its legislative history, its language, the purpose it is to serve, and the circumstances surrounding its enactment. *Board of Education* v. *Connecticut State Board of Education,* 179 Conn. 694, 700 n.3, 427 A.2d 846; *Schwarzschild* v. *Binsse,* 170 Conn. 212, 216, 365 A.2d 1195.

This court has taken judicial notice of statements made in the course of debate on the floor of the House and the Senate and has suggested that these discussions are strongly indicative, if not necessarily controlling, on the issue of legislative intent. *Tax Commissioner* v. *Estate of Bissell,* 173 Conn. 232, 245, 377 A.2d 305; *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 223–24, 332 A.2d 83; *Miller* v. *Board of Education,* 166 Conn. 189, 194–95, 384 A.2d 584; *Lee* v. *Lee,* 145 Conn. 355, 358, 143 A.2d 154. Statements made on the floor of a lawmaking body, moreover, can be indicative of the circumstances surrounding a statute's enactment; see *Menzies* v. *Fisher,* 165 Conn. 338, 342, 334 A.2d 452; *Hartford Electric Light Co.* v. *Wethersfield,* supra, 223; as well as of the purpose the statute is to serve. *Menzies* v. *Fisher,* supra, 344; *Hartford Electric Light Co.* v. *Wethersfield,* supra. The defendant employer also urges that this court consider the

legislative debates and is sanguine that the discussions on the floors of the General Assembly reveal a legislative intent to construe "for cause" as work related. Nonetheless, we approach our attempt to glean the legislative intent from the floor debates with caution and circumspection because we recognize that legislative discussions may only be expressive of the views and motives of individual members and may not be a safe guide to views of the lawmaking body. See *Duplex Printing Press Co.* v. *Deering,* 254 U.S. 443, 474, 41 S. Ct. 172, 65 L. Ed. 349. For instance, those who did not speak may not have agreed with those who did. *United States* v. *Trans-Missouri Freight Assn.,* 166 U.S. 290, 318, 17 S. Ct. 540, 41 L. Ed. 1007.

Substitute Senate bill 59, as amended by Senate amendment schedule "A," was eventually adopted by the General Assembly and became Public Act No. 77-323. Senate amendment schedule "A," which contains the words at issue on this appeal, was extensively and heatedly debated on both floors of the General Assembly. Eight senators spoke in favor of the amendment; nine in opposition. Fifteen members of the House spoke in opposition to the Senate bill as amended by schedule "A"; seven in favor. Few of the words in these debates, however, were directed at an explanation of the meaning of the words "for cause" found in § 31-236 (2) (a).

Senator James J. Murphy, Jr., who introduced substitute Senate bill 59 in the Senate on behalf of the committee on labor and industrial relations, explained the purpose of Senate amendment "A" as follows: "Mr. President, if adopted, the amendment becomes the crux of the bill. *What it does is change the criteria as to those persons who voluntarily*

*leave their jobs and removes from the present law
the cause aspect related to their work. Presently,
one who leaves for cause related to their work is not
considered a quit.* Without the cause aspect remains
in the legislation or related to the work is removed,
and it also provides that no person shall be ineligible
for unemployment compensation benefits if they
leave suitable work as a result of changes in condi-
tions brought about by their employer. It also, Mr.
President, for those who leave their employment for
reasons other than those covered by the law as it
would be amended would be ineligible for unem-
ployment compensation until they had earned ten
times their benefit ratio. As it is now, Mr. President,
someone is penalized four weeks . . ." 20 S. Proc.,
Pt. 4, 1977 Sess., pp. 1478–79. (Emphasis added.)

The second and third sentences of the statement,
which have been italicized, appear to indicate that
the amendment was meant to remove the criteria
that eligibility for benefits is dependent upon leav-
ing work for reasons connected with employment.[3]
The lack of clarity, however, in the following phrase
"[w]ithout the cause aspect remains in the legis-
lation or related to the work is removed . . ." under-
mines any attribution of certainty to this statement
concerning the meaning of "for cause."

---

[3] As we have noted, prior decisions of this court clearly indicate
that individuals who quit jobs for reasons unrelated to their unem-
ployment were disqualified for a statutorily prescribed period from
receiving unemployment compensation. *Schettino* v. *Administrator,*
138 Conn. 253, 83 A.2d 217; *Consiglio* v. *Administrator,* 137 Conn.
693, 81 A.2d 351; *Wyka* v. *Colt's Patent Fire Arms Mfg. Co.,* 129
Conn. 71, 26 A.2d 465.

Thus, Senator Murphy's remark that under Connecticut's "quits"
law prior to the enactment of Public Act No. 77-323, "one who leaves
for cause related to their work is not considered a quit," is an
acknowledgment of the state of the law at the time.

The senator's foregoing statement contains the only direct comment in the lengthy Senate proceeding on the words in § 31-236 (2) (a) at issue on this appeal. Nonetheless, although the sponsoring senator's opening remarks on the words of the amendment fail to indicate with absolute clarity whether the phrase "for cause" is intended to have a job related requirement, his subsequent discussion of the amendment is persuasive that its intent and purpose was not to have eligibility depend upon leaving for job-related cause.

"Basically, Mr. President, the intent of this amendment is to narrow down that category of persons who are considered to be quits under our unemployment compensation statute, but for those persons who fall within the narrowed limit to exclude them from receiving unemployment compensation until they have earned at least ten times their benefit ratio. The intent here, Mr. President, in broadening the scope as to those people who would otherwise qualify for unemployment is: a. to take into consideration those persons who, under our present law, are forced to leave their job but are penalized for the four week period. They would receive workmen's compensation, unemployment compensation, after the one week standard week just like anyone else who is laid off, but the true intent here, Mr. President, by this amendment, is to penalize only the people who have been abusing the system and who have been leaving their jobs for no reason and have been collecting unemployment compensation and I move adoption of the amendment. . . . There are a number of people who are today, under our present law, considered to be quits, would no longer be quits. For those people falling into that category, they would be treated for unemployment com-

pensation purposes like anyone else who was laid off. They would receive unemployment compensation after the one week standard delay. For those people who fall into this narrowed category of "quits," it is true for these people who leave their job for no reason, they would not be eligible for unemployment compensation, or unemployment compensation would be barred for them until such time as they have earned ten times their benefit ratio. . . . It's really an attempt to address itself to what's considered to be one of the major abuses. It does set a new criteria in limiting or curtailing the size of the group that would be considered quits, but it would treat those people who would thereafter be considered quits in a much more severe way than we have in the past. . . . [I]f someone is considered to be truly a quit for leaving their job for no cause . . . [t]hey'd be a quit under the bill and not entitled to unemployment compensation until they had earned ten times their earnings ratio." 20 S. Proc., Pt. 4, 1977 Sess., pp. 1480–83.

The foregoing extensive explanation repeatedly asserts that the intent of the proposed amendment to the bill was to narrow the category of persons considered "quits," or, in other words, expand the category of those eligible for unemployment compensation without subjecting them to the newly enacted disqualification period. The individuals who fell into the narrowed category of "quits" would be treated more harshly—they would be barred from receiving unemployment compensation, not for a four week period as under the law prior to the enactment of Public Act No. 77-323, but until such time as they had earned ten times their benefit rates. In effect, as another senator remarked, this bar would serve to permanently disqualify those claim-

ants who fell into the narrowed category of "quits" under Public Act No. 77-323. See 20 S. Proc., Pt. 4, 1977 Sess., pp. 1517–18, 1521.

Under § 31-236 (2) (a) prior to the enactment of Public Act No. 77-323, only those who left their jobs involuntarily or for cause related to their work were not considered "quits" and were eligible to receive unemployment compensation without the four week disqualification period. Thus, an assertion that the category of "quits" was narrowed by the legislation which became Public Act No. 77-323 can only be interpreted as meaning that the job-related criteria for cause are no longer controlling on the issue of what the nature of the cause must be for eligibility for benefits. Such a reading is entirely consistent with Senator Murphy's assertion that the true intent of the amendment is to penalize only the people who have been abusing the system by leaving their jobs for no reason at all except to collect unemployment compensation. 20 S. Proc., Pt. 4, 1977 Sess., pp. 1480–83. The defendant employer argues that the class of "quits" was narrowed only by excluding from disqualification those employees who could be considered "constructive departures," namely, those for whom an employer had made conditions so unbearable that the employee had no choice but to resign. This interpretation of the effect of Public Act No. 77-323, however, and of the intent of the General Assembly in passing it is completely unpersuasive.

First, the defendant employer has not cited for us a single decision of this court, nor have we been able to find one, that indicates that a departure caused by an employer's creation of unbearable conditions would not be considered a departure for

work-related cause. In fact, in the most thorough discussion on the subject of "constructive departures" that we have found; note, 76 A.L.R.3d 1089; it is stated that in relation to "constructive departures" the issue of whether good cause for departure is attributable to the employee's work is irrelevant, since harassment or other mistreatment by a worker's employer is clearly work related. Id., 1092 n.8. Therefore, deeming "constructive departures" as excluded from disqualification does not narrow the class of "quits" under prior law.

Second, the defendant employer's interpretation violates the plain meaning of the proviso added to § 31-236 (2) (a) by Public Act No. 77-323, which, to reiterate, reads "provided no individual shall be ineligible for benefits if he leaves suitable work for cause, including leaving as a result of changes in conditions created by his employer . . . ." If Public Act No. 77-323 were intended to narrow the class of "quits" only by excluding from disqualification "constructive departures," the words "suitable work for cause, including leaving" would be eliminated. Such an interpretation would thus, in this instance, violate the principle that, if possible, a statutory provision should be construed so that no word or phrase is rendered meaningless. *Connecticut Light & Power Co.* v. *Costle,* 179 Conn. 415, 422-23, 426 A.2d 1324. If the proviso is interpreted as narrowing the class of "quits" by excluding from disqualification those individuals who quit "for cause, including . . ." then no phrase or word is rendered superfluous. Furthermore, the defendant's construction by eliminating the word "including" would torture the language of the proviso in such a fashion as to make what is clearly a part, namely, "constructive departures," swallow and eliminate

what is equally clearly the whole, namely departures "for cause," of which "constructive departures" is a part. Such an interpretation also ignores draftsmanship that employs the word "including" so as to indicate an unexclusive illustration.

Finally, nothing in Senator Murphy's remarks or in the statements of the other senators indicates that the class of "quits" was to be narrowed only by excluding from disqualification "constructive departures." On the contrary, as we have noted, the opposite is true. Senator Murphy's remarks indicate that the class of "quits" was to be narrowed by excluding from disqualification all those who departed for cause and not simply to collect unemployment compensation. A few senators discussed the problem of constructive departures; 20 S. Proc., Pt. 4, 1977 Sess., pp. 1500–1501, 1510, 1530–31; but none stated or even suggested that "constructive departures" alone would be added to the class of those who could meet the requirements of Public Act No. 77-323 for eligibility for unemployment compensation.

To say that the bill was directed at those individuals who quit their jobs merely to collect unemployment compensation, albeit after waiting until four weeks had passed, would not only be consistent with Senator Murphy's statement of the true intent of the bill,[4] but would also be faithful to the thrust of the discussion that dominates the Senate debate on the amendment.

---

[4] It is recognized that the statement of the legislator who reported the bill out of committee carries particular weight and deserves careful consideration. See *Sullivan* v. *Town Council,* 143 Conn. 280, 287, 121 A.2d 630; see also *New Haven* v. *Public Utilities Commission,* 165 Conn. 687, 695, 345 A.2d 563. See generally, 2A Sutherland, Statutory Construction (4th Ed.) § 48.14.

Every senator, who addressed either directly or indirectly the question of who would be considered "quits" under the amendment either asserted or implied that the only intent of the amendment that was clear was the disqualification from unemployment compensation of those individuals who quit for no reason, and the more particular intent was the disqualification of those persons who quit only to be able to collect benefits. Senators who spoke in opposition to the amendment expressed their opposition to those who abused the law by, inter alia, terming them "chiselers," "free-loaders" and "cheat[ers]"; 20 S. Proc., Pt. 4, 1977 Sess., pp. 1484, 1501; see also 20 S. Proc., Pt. 4, 1977 Sess., pp. 1498, 1513; but nonetheless opposed the amendment because, as some asserted, they felt that the amendment was not necessary just to correct the abuses, and it risked placing on public assistance those who should more properly be receiving unemployment compensation paid for by employers. 20 S. Proc., Pt. 4, 1977 Sess., pp. 1484, 1486, 1498–99, 1501, 1510, 1513–16, 1527. None of the senators who spoke in opposition to the amendment indicated that individuals who left for non-work-related causes would necessarily be disqualified from receiving benefits.

Similarly, and more pertinently, statements of those senators, besides Senator Murphy, who spoke in support of the amendment, also indicated both that the amendment's intent was not to disqualify all who left work for non-job-related causes and that the amendment was addressed to those who abused the unemployment compensation system. See 20 S. Proc., Pt. 4, 1977 Sess., pp. 1517–19 ("People who leave work through no fault of their own have to be compensated . . . and would be under our old law

and this amendment compensated . . . but . . . they get the very same dollar as those who quit, who desire to quit."), 1521 ("[A] large fraction of our unemployment figure . . . constitutes people taking advantage of very good arrangements."), 1523 ("The legitimate employee who has worked for years, eight hours a day and toiled, who has been separated from his employment through no fault of his own. I will fight for him every day of my life. I will vote benefits for him every day of my life, but I will not for one day longer support those same benefits in like kind and quality for the ski-bum and for the sand and surf bum who leave work voluntarily."), 1531 ("The fact of the matter is, that the basic intent of unemployment compensation was to protect people, who through no fault of their own, lost jobs, and we, over the years in Connecticut and other states, have enlarged that into a, almost a, welfare program."). See also 20 S. Proc., Pt. 4, 1977 Sess., pp. 1529, 1532-33, 1535.

Finally, other concerns, which were voiced in the Senate debate and which focused on the purpose of the amendment and the circumstances that led to its advocacy, are readily met by viewing the amendment in a manner that is consistent with Senator Murphy's statements. A large portion of the Senate debate was concerned with the effect of the amendment on the business climate insofar as the amendment would help create and retain jobs by making Connecticut more attractive to business and industry. Those in favor of the amendment thought that it would reduce employers' liability for contributions to the unemployment fund; see General Statutes § 31-225; and would significantly improve the business climate and thus help create jobs. See 20

S. Proc., Pt. 4, 1977 Sess., pp. 1496, 1519, 1523, 1533–34. Those in opposition to the amendment questioned its efficacy in improving the business climate.

Much of the Senate debate was also devoted to the question of the cost of the unemployment compensation fund to employers, and the effect of the amendment on that cost. 20 S. Proc., Pt. 4, 1977 Sess., pp. 1489, 1493, 1514, 1519–20, 1523–24, 1533. If the amendment is interpreted consistently with Senator Murphy's views that the class of quits is narrowed but that the narrower class is, in effect, permanently disqualified from receiving benefits, it seems clear that the total amount of unemployment compensation benefits could be reduced and with it the employers' cost. Although the class of those that would be eligible for benefits would be greater, the permanent disqualification, instead of a mere four week bar, of those who quit for no reason at all or for inadequate reasons could easily more than make up the difference, particularly if the abusers of the system are as great in number as the Senate discussion of the amendment would suggest. That the permanent disqualification of those who quit for no reason at all was intended to reduce employers' cost can be gathered from the statements in the Senate debate about those who did quit for no reason but to take advantage of the unemployment compensation system prior to the enactment of Public Act No. 77-323.

After reviewing the Senate's discussion of the amendment at issue, we cannot conclude anything but that the Senate manifested no intent that the term "for cause" was to mean only for job-related cause. We need only note briefly that the members of the House of Representatives, in their own exten-

sive debate on the Senate bill, did not express a different intention as to the meaning of "for cause." The first three members of the House to speak on the Senate bill rose in opposition to the bill on the express ground that the bill was unclear and that the lack of clarity extended to the phrase "for cause." 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4099–4102; see also 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4139, 4145. Although the questions concerning the meaning of "for cause" that initiated the House discussion remained unanswered throughout that discussion, the thrust of the House debates does not demonstrate a different intent from that of the Senate.

The debate in the House then went on to cover, for the most part, the same topics that arose in the Senate, e.g., the effect of the amendment on the business climate and the cost of unemployment compensation to employers; 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4105, 4111, 4122, 4124, 4132; the deficits in the unemployment compensation fund; 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4122, 4124, 4142, 4144; and the effect of the amendment on public assistance rolls. 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4104, 4126. Nevertheless, the House concerned itself with the question of abuse of the unemployment compensation system to a far greater extent than even the Senate did. See 20 H. R. Proc., Pt. 10, 1977 Sess., pp. 4103, 4112–13, 4116–17, 4119, 4121–22, 4124, 4131, 4134, 4136–38, 4143–46.

At the commencement of our review of the legislative debates for the purpose of gleaning legislative intent, we stated that such a review must be con-

ducted with caution.[5] It is that concern that has led this court to a careful study of all of the extensive legislative debate on Public Act No. 77-323. It is from that study that we are ineluctably led to the conclusion that the words "for cause" must be interpreted to include non-job-related cause. That the general assembly expressed an intent *not* to enact legislation which would permanently disqualify from benefits all individuals who left work for non-job-related reasons is apparent from, inter alia, its focus only on the disqualification of those abusers of

---

[5] It is this same caution that causes us to reject the defendant's suggestion that, in addition to the legislative debates, we should consider the effect on the meaning of "for cause" of the Senate's failure to pass substitute Senate bill 59 as it existed prior to Senator Murphy's amendment. Substitute Senate bill 59, as recommended for passage by the committee on labor and industrial relations, provided for ineligibility for an employee who quit: "during the week in which . . . he has left suitable work voluntarily and without compelling reasons, and for the next six following weeks." The defendant would have us interpret the Senate's failure to approve the bill in the above form as a clear indication that "for cause" must be read as for job-related cause since the rejected form of the bill would have provided for eligibility not dependent on job-related reasons for leaving. It is equally likely, however, that a myriad of other considerations caused the Senate to reject the bill recommended by the committee on labor and industrial relations, including one that involved the inadequacy of the six week disqualification period in the recommended bill. Furthermore, to accept a construction based on changes made without explanation—the form of the Senate bill recommended by the committee on labor and industrial relations was not debated—would be to abandon the caution that has marked our review of the legislative history and to indulge in speculation on the meaning of "mute intermediate legislative maneuvers." *Trailmobile Co.* v. *Whirls,* 331 U.S. 40, 61, 67 S. Ct. 982, 91 L. Ed. 1328.

Following the approval of Senate amendment "A" as an amendment to substitute Senate bill 59, the Senate rejected two attempts by opponents of the approved bill to amend it. The defendant would also have us consider the effect of these two unsuccessful efforts. We reject this suggestion as well.

The debate was limited and again any interpretation of the meaning of the rejections of the proposed amendments would be an indul-

the unemployment compensation system who quit their jobs just to collect benefits and the express and uncontradicted remarks of the senator who sponsored the bill concerning its purpose. The complete absence of any express language in the debates suggesting that "for cause" means "for job related cause" can lead to no other conclusion. We have repeatedly iterated that "this court is precluded from substituting its own ideas of what might be a wise provision in place of a clear expression of legislative will."[6] *Penfield* v. *Jarvis,* 175 Conn. 463, 474–75, 399 A.2d 1280; *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 415, 311 A.2d 65.

---

gence in speculation. Again the reasons for rejection could be myriad and, although there exist express reasons for rejection here, they are unilluminating.

Senator Murphy stated his opposition to the first proposed amendment in the following words: "Mr. President, I rise to oppose the amendment. Simply put, I think the amendment is offered to nullify the previous amendment [Senate A] that we've put through and in some respects, I almost take it as an insult that the amendment is offered . . ." 20 S. Proc., Pt. 4, 1977 Sess., p. 1537. This statement supports the generally accepted proposition that the fact of a refusal to adopt an amendment is an unreliable guide to statutory construction. See, e.g., *Board of Education* v. *New Jersey Education Assn.,* 53 N.J. 29, 48, 247 A.2d 867; cf. *Anderson* v. *Ludgin,* 175 Conn. 545, 554 n.8, 400 A.2d 712.

[6] Finally, we note that we have also attempted to find guidance on how to construe "for cause" from other seemingly relevant principles of statutory construction, but when applied to the question that confronts us, these principles have not been helpful. For instance, amendments carry with them a presumption that they are effecting a change in the existing law. *Stamford* v. *Stamford,* 107 Conn. 596, 606, 141 A. 891. See generally, 1A Sutherland, Statutory Construction (4th Ed.) § 22.30. Nonetheless, the presumed change does not go further than that which is expressly declared or necessarily implied. *Doe* v. *Institute of Living, Inc.,* 175 Conn. 49, 63, 392 A.2d 491; *State* v. *Fahy,* 149 Conn. 577, 582, 183 A.2d 256.

Public Act No. 77-323 expressly changes the disqualification period for the receipt of unemployment compensation benefits. In light of this alteration of existing law, however, it is ambiguous as to how one should read Public Act No. 77-323 so as to effect the further change of existing law that is necessary because of the change of disqualifi-

Having determined as a threshold matter that "for cause" within the context of General Statutes § 31-236 (2) (a) encompasses reasons which are not job related, we next consider whether the plaintiff's voluntary leaving of suitable work in the present case was "for cause" within the meaning of that phrase in the statute. Since, as we noted previously, the phrase is not defined in the statute and this court has not had a previous occasion to define it, we look for guidance to the decisions of other jurisdictions in the field of unemployment compensation law.

In those jurisdictions which have unemployment compensation statutes, like Connecticut's § 31-236 (2) (a), where cause need not be attributed to employment, these statutes generally provide that the claimant is ineligible for unemployment compensation, either completely or for a designated waiting period, if he leaves voluntarily without good cause. See, e.g., Cal. Unemp. Ins. Code § 1256 (Deering); Idaho Code § 72-1366 (e); R.I. Gen. Laws § 28-44-17; Washington Rev. Code Ann. § 50.20.050. That "for cause" in § 31-236 (2) (a) can readily be equated with "good cause" is apparent from the ordinary and customary meaning of "for cause" which is "[for] a good or adequate reason." Webster, Third New International Dictionary. To claim

---

cation period. The further change could be that the class of people affected by the change in disqualification period be as few as possible. Thus, "for cause" would not be attributed to employment so as to narrow the class affected by the express change in the law. On the other hand, the further change could be seen as involving no change of the prior standard of work-related cause. Although the class of people affected by the new severe disqualification period would be larger than under the aforementioned construction of the provision, the standard for eligibility would remain the same as before. Because both of these readings are equally tenable, neither is necessarily implied and an application of the maxim of statutory construction referred to above did not aid us in resolving the ambiguity in Public Act No. 77-323 that is inherent in its language.

that "for cause" could mean anything other than good cause would be to negate the import of the phrase entirely.[7]

To be entitled to benefits in those jurisdictions which have unemployment compensation statutes where good cause need not be attributed to employment, claimants must show that they have left employment for reasons which would impel the ordinary reasonable person to leave and which provide the individual with no reasonable alternative but to terminate his employment. *Evenson* v. *Unemployment Insurance Appeals Board,* 62 Cal. App. 3d 1005, 133 Cal. Rptr. 488; *Meyer* v. *Skyline Mobile Homes,* 99 Idaho 754, 589 P.2d 89; *Ayers* v. *Employment Security Department,* 85 Wash. 2d 550, 536 P.2d 610 (husband was not disqualified from receiving benefits where he quit a temporary job and moved to another city to join wife who had recently secured permanent employment); *Western Printing & Lithographing Co.* v. *Industrial Commission,* 260 Wis. 124, 50 N.W.2d 410. See also Pa. Stat. Ann. tit. 43, § 802 (b) (1) (Purdon) (1959 amendment substituted "cause of a necessitous and compelling nature" for "good cause.").

The case law in other jurisdictions thus is in harmony with the legislative intent evinced in the debates in Connecticut's General Assembly, which emphasized the legislature's desire to disqualify permanently those who quit for no reason at all. These debates suggest that cause, if it be personal, must be such as would leave a reasonable person no alternative but to depart from his work.

---

[7] In other statutory contexts this court has consistently interpreted "for cause" as synonymous with nonfrivolous reasons or good cause. E.g., *Molino* v. *Board of Public Safety,* 154 Conn. 368, 374, 225 A.2d 805; *Riley* v. *Board of Police Commissioners,* 147 Conn. 113, 118, 157 A.2d 590.

After considering the plaintiff's circumstances, the referee concluded that there was no evidence that she had available to her any other reasonable alternative measure that might have averted her departure from her employment in Connecticut. Thus, we cannot say that the Superior Court erred in affirming the referee's decision that the plaintiff's leaving her employment was for cause within the intent of the statute. The referee's conclusion is supported by his findings of fact and is legally consistent with those findings.

Our conclusion here is influenced by two factors. The defendant employer does not contest the fact that the plaintiff's reasons for leaving would be "for cause" if "for cause" encompassed personal as well as work-related reasons. Second, the primary purpose of the Unemployment Compensation Act was to relieve the distress of unemployment, and it has consistently been regarded as remedial in character and as to be construed liberally in regard to the beneficiaries. *Halabi* v. *Administrator,* 171 Conn. 316, 322, 370 A.2d 938; *Taminiski* v. *Administrator,* 168 Conn. 324, 328, 362 A.2d 868; *Furber* v. *Administrator,* 164 Conn. 446, 454, 324 A.2d 254; *United Aircraft Corporation* v. *Fusari,* 163 Conn. 401, 410, 311 A.2d 65. The legislature has emphasized this remedial purpose in General Statutes § 31-274 (c): "The provisions of this chapter shall be construed, interpreted and administered in such a manner as to presume coverage, eligibility and nondisqualification in doubtful cases."

There is no error.

In this opinion the other judges concurred.