[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a statutory appeal concerning unemployment compensation. The CT Page 763 record reveals the following: The administrator denied the plaintiff-claimant's application for benefits. The referee upon the appeal of the plaintiff-claimant Debra White, conducted a hearing de novo, made findings of fact and reversed the denial of benefits. The employer, Chelsea Place Care Center LLC, appealed that decision to the board of review. The board adopted some of the findings of the referee, modified others and reversed his decision. Plaintiff here appeals the decision of the board to the Superior Court.
The Superior Court in hearing an unemployment compensation appeal under Conn.Gen. Stat. Sec. 31-2.49b does not hear the case de novo. The function of the court is to sit as an appellate court in reviewing the record certified by the board of review. The court does not retry the facts or hear evidence. United Parcel Service, Inc. v. Administrator, 209 Conn. 381,385, 551 A.2d 724 (1988). Finkenstein v. Administrator, 192 Conn. 104,112, 470 A.2d 1196 (1984). The court is bound by the findings of subordinate fact and the reasonable factual conclusions of the board.Finkenstein v. Administrator, 192 Conn. at 112; Robinson v. UnemploymentSecurity Board of Review: 181 Conn. 1, 4, 434 A.2d 393 (1980); Gueverav. Administrator, 172 Conn. 492, 495, 379 A.2d 1101 (1977). The court may go no farther than to determine whether the board's decision is arbitrary, unreasonable or illegal. Id. The board's decision must stand if it results from a correct application of the law to the findings of fact and could reasonably follow from those findings. Finkenstein,192 Conn. at 113; Robinson, 181 Conn. at 5. It is solely the function of the board to weigh the evidence and assess the credibility of the witnesses.Id., and Conn. Practice Book Sec. 22-9.
The findings of fact of the board adopted from the referee as modified by the board are as follows:
 1. The claimant worked as a charge nurse at $21.50 hourly from March 1999 until April 13, 2000. The claimant served on the second shift, 3:00 p.m. to 11:00 p.m.
 2. The claimant received her B.S.N. degree in 1982 and worked as a nurse through October, 1990.
 3. The claimant then took a different path in her life and moved to Oklahoma. She received a M. Div. degree from Oral Roberts University in 1997.
 4. At all times, the claimant maintained her Connecticut license as a nurse.
5. The claimant worked briefly as a nurse in Oklahoma before returning CT Page 764 to Connecticut.
 6. On June 17, 1999, the employer issued the claimant a verbal warning for failing to transcribe a medication order for a resident. She was expected to write the resident's medications on a form.
 7. On November 23, 1999, the employer issued the claimant a written warning for failing to notify the house physician that a new resident had been admitted to the facility. As a result, the resident's prescriptions were not verified.
 8. On December 8, 1999, the employer issued the claimant a written warning and one-day suspension for failing to administer Klonopin to a psychiatric patient.
 9. On April 6, 2000, the claimant began her two-hour medication pass at 4:00 p.m. At 4:45 p.m., a resident who had just returned from the hospital after surgery presented her with an envelope containing a prescription for pain medication, ordered by his surgeon. However, the surgeon had not included a Form W-10 in the envelope.
 10. The Form W-10 includes any medical information such as prescription changes or new medications.
 11. Without the order properly posted, the employer technically cannot administer the medication to patient/resident.
 12. The claimant was discharged by Marilyn Griffith, director of nurses.
 13. The claimant was concerned that because the pharmacy closed at 5:00 p.m., she would have to use the employer's emergency-protocol, which called for her to request assistance from a supervisor in readmitting the resident and verifying the medication. Therefore, she decided to place the order with the pharmacy immediately, without verifying the medication. (The doctor was called for verification) prior to ordering DW 11-20-00).
 14. The claimant was aware of the employer's policy and that its purpose was to prevent medication errors. She was also aware that her job was in jeopardy due to her errors in verifying and writing medication orders immediately.
It should be noted at this point that the Board's factual findings numbers 6, 7 and 8 were admitted into evidence by the appeals referee not for the truth of the matters asserted but to show the state of mind of CT Page 765 the employer.
In the instant case four exhibits A, B, C, and D were admitted into evidence by the appeals referee not for the truth of the matters asserted but to show the state of mind of the employer. Exhibit A was a record of a one day suspension issued 12/9/99 for failing to administer Klonopin to a patient. Exhibit B was a written warning referenced on November 19, 1999 having to do with failure to notify a doctor of an admission. Exhibit C was an oral warning given on June 17, 1999 for failing to transcribe an order. Exhibit D was an oral warning given on October 25, 1999 for addressing residents in an inappropriate, loud and abrupt manner. When Debra White attempted to respond to these earlier matters the Appeals Referee advised her that it was not necessary since these matters were admitted only to show the state of mind of the employer, not for the truth of the matters asserted. He assured her that he would not take the matters themselves into consideration when making his decision and it would appear from his decision that he did not consider them. However, the Appeals Referee did make them factual findings in his findings of fact. These were numbered 6, 7, 8 of the Appeals RefereeFindings of Fact. The Board of Review in its Findings of Fact included those matters as factual findings numbers 6, 7 and 8 and expanded on them. The Board of Review did in fact include these as substantive facts in arriving at its decision to reverse the Appeals Referee. This is evidenced by the following excerpt from the Board's decision:
 In the case before us, the claimant's one-year employment history is replete with warnings and a suspension for her violating the employer's verification policy. There is ample evidence that the claimant was aware of the employer's protocol for verifying medication, that she had been warned for past violations, and that she was aware that her job was in jeopardy for violating the policy prior to the final incident on April 6, 2000; There is no evidence of any compelling reason for her failure to invoke the employer's emergency protocol to follow the verification policy on April 6, 2000. Under the circumstances, we find that the employer has established that the claimant's discharge was a reasonable application of the policy. See Strother v. Retavision, Inc., Board Case No. 1076-BR-99 (9/20/99)."
This is in contrast to the Appeals Referee's decision which is as follows:
ISSUE
 The issue raised by this appeal is whether the employer, Chelsea Place Care Center, LLC, discharged the claimant, Debra J. White, for deliberate misconduct in the course of her employment.
CT Page 766
PROVISIONS OF LAW
 For separations occurring after October 1, 1995, Section 31-236 (a)(2) (B) of the Connecticut Unemployment Compensation Act, as amended by No. 95-323 of the 1995 Public Acts, provides that an individual shall be ineligible for benefits if it is found that he was discharged or suspended for wilful misconduct in the course of his employment. The ineligibility for benefits will be in effect until such individual has earned at least ten times his benefit rate.
 For separations occurring after October 1, 1995, Section 31-236 (a)(2) (B) of the Connecticut Unemployment Compensation Act, as amended by No. 95-323 of the 1995 Public Acts, defines "wilful misconduct" as deliberate misconduct in wilful disregard of the employer's interest or as a single knowing violation of an employer's reasonable and uniformly enforced rule or policy, when reasonably applied, unless the violation is due to an employee's incompetence.
 ANALYSIS AND CONCLUSION OF LAW
 Unsatisfactory work performance that is not attributable to a claimant's reckless indifference to or wilful disregard of the reasonable requirements of the job generally does not constitute deliberate or wilful misconduct. Conn. Agencies Regs. § 31-236-26a. Misconduct resulting from inefficiency, carelessness, negligence, or errors in judgment lacks the requisite culpability to be considered wilful because it does not demonstrate an intentional, substantial disregard of the employer's interest or an intentional disregard of the duties, obligations and responsibilities the employee owes to his employer. Duperry v. Administrator, 25 Conn. Sup. 409 (1964)
 The Referee finds that the claimant did not deliberately fail to meet her employer's expectations, to include her failure to note as an MD order a prescription for Tylox for a resident under her care. The claimant had been out of nursing for over eight years when she signed on with the employer in March 1999. Although she tried to meet expectations, it became clear that she would occasionally forget to do tasks that she was supposed to do — perhaps the profession has gotten more complicated, perhaps the claimant's outlook or methodology of thinking changed. The Referee is convinced that the claimant did not intentionally perform below expectations with the employer — she was a credible witness and seemed genuinely distressed by the entire situation. She did not make excuses for what had occurred. An intentional and substantial disregard of the employer's interests has not been established by the employer to a preponderance of the CT Page 767 evidence.
 The employer, Chelsea Place Care Center, discharged the claimant, Debra J. White, for reasons other than wilful misconduct in the course of her employment. As a result, the claimant is not disqualified from receiving unemployment compensation benefits pursuant to Conn.Gen. Stat. Sec. 31-236 (a)(2)(B).
There is no question but that Debra White was prejudiced by the action of the Board in factoring in the previous matters. First, because she was not put on notice that they were even to be considered, and second, because these matters were not relevant to the issue of whether or not the act for which she was terminated was an act of wilful misconduct.
The Appeals Referee who conducted the face to face hearing was able to observe the demeanor of Debra White. In fact, he stated in his analysis that he was convinced that she did not intentionally perform below expectations with the employer, that she was a credible witness and seemed genuinely distressed by the entire situation, that she did not make excuses for what had occurred and concluded that an intentional and substantial disregard of the employer's interests had not been established by the employer to a preponderance of the evidence. Attached as Exhibit A is part of Debra White's testimony at the hearing before the Appeals Referee. (Transcript pp. 31-40).
This court finds that the Board of Review acted illegally in considering the substantive content of those matters admitted for other than the truth of the assertions contained therein.
The transcript made it perfectly clear that these matters were not admitted into evidence for the truth of the matters asserted.
The defendant's motion for judgment of dismissal is DENIED.
The decision of the Board of Review is REVERSED. Judgment may enter in favor of the plaintiff Debra White.
 ___________________ Hennessey, J.
 EXHIBIT A | 31 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 CT Page 768 |
1| May I assume that but for these brief 2| forays into your profession of nursing, before you 3| started with this employer, you really hadn't worked in 4| nursing for a number of years. Is that true? 5| MS. WHITE: Correct. 1990. 6| APPEALS REFEREE NELSON: Okay. Is — 7| strike that. Did you have to update your license or 8| anything like that so you could go to work for this 9| company? 10| MS. WHITE: I maintained my license in 11| Connecticut. I have an Oklahoma license, a Connecticut 12| license and a Texas license. I needed to take 13| continuing education units to maintain the Texas 14| license and the California license, which I did up 15| until I can only guess about 1994 or '95. 16| APPEALS REFEREE NELSON: Okay. 17| MS. WHITE: And then I let — I let the 18| California lapse. I had never actually worked in 19| California, though I had lived out there and had been 20| involved in the ministry out there, which was 21| unrelated. 22| APPEALS REFEREE NELSON: Sure. Okay. 23| MS. WHITE: And in Texas, I was student. 24| I did work, but un-- in an unpaid capacity. It was a |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 32 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| tuition exchange situation. So I had the license for 2| that purpose. And I kept them, not knowing if I would 3| return to any of these locations. 4| APPEALS REFEREE NELSON: Okay. 5| MS. WHITE: But I did not work. 6| APPEALS REFEREE NELSON: Okay. So 7| nursing in Connecticut is like being a lawyer in 8| Connecticut. You don't require any continuing 9| education to keep your license? 10| MS. WHITE: Not in Connecticut at this 11| point in time that I know of. 12| APPEALS REFEREE NELSON: Okay. CT Page 769 13| MS. WHITE: Though I think 14| they're considering that. 15| APPEALS REFEREE NELSON: Okay. That's 16| true of the legal profession, too. That's why I'm 17| asking. That's not the norm any more. But it is true 18| in Connecticut, as far as I know. Certainly for the 19| legal profession. 20| Okay. Now, did the Employer offer you 21| or did you ask for any remedial training or continuing 22| education when you started to work for them? 23| MS. WHITE: No. However, they were kind 24| and gracious, I must say, in giving me a one-month |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 33 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| orientation. I needed that. You can know something 2| and still retain the knowledge. But putting it into 3| practice, doing it in a time frame and so forth does 4| need time to refresh in that way and — 5| APPEALS REFEREE NELSON: Okay. 6| MS. WHITE: I'm sorry for my grammar. 7| APPEALS REFEREE NELSON: It's all right. 8| When you left nursing in October of 1990 9| — and I notice you had worked at the Red Cross. Did 10| you leave for any performance reason or did you leave 11| for some other reason? 12| MS. WHITE: I left for other reasons. 13| APPEALS REFEREE NELSON: Other reasons. 14| Okay. Did you intentionally fail to transcribe the 15| order for Tylox into the doctor's notes? 16| MS. WHITE: I did not intentionally 17| (Indiscernible) 18| APPEALS REFEREE NELSON: To what do you 19| ascribe your error in that regard? 20| MS. WHITE: I can — I can relay the 21| events, best I can remember them, in somewhat of a 22| story form that you may understand what happened. 23| APPEALS REFEREE NELSON: Okay. 24| MS. WHITE: If you'd like me to do that. |
CT Page 770 | POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 34 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| APPEALS REFEREE NELSON: Sure. 2| MS. WHITE: Okay. I started the 3| medication pass probably approximately 4:00. The 4| patient returned from his day surgery at approximately 5| 4:45 P.M. 6| APPEALS REFEREE NELSON: Okay. 7| MS. WHITE: He may have returned to the 8| facility earlier. I don't know. But he came to the 9| floor in his wheelchair and wheeled up to the 10| medication cart at 4:45. 11| APPEALS REFEREE NELSON: Okay. 12| MS. WHITE: Whether he was in the 13| facility, I don't know. But he didn't come back to the 14| floor and, to my knowledge, he wasn't in the facility 15| earlier for me to have done anything at any earlier 16| point in time. 17| In the middle of the medication pass, 18| which takes at least two hours, if not close to at 19| least two hours, realistically speaking sometimes it 20| does, things happen such as this. 21| He came up to the cart at 4:45. I took 22| a look at the papers he had. I saw he had no W-10. He 23| should have had a W-10. 24| APPEALS REFEREE NELSON: What is that? |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 35 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| MS. WHITE: It's a — it's a legal form, 2| medical form, which would have come from the physician 3| or the surgeon or, you know, the personnel associated 4| with the surgical area. 5| APPEALS REFEREE NELSON: Right. CT Page 771 6| MS. WHITE: And it would have had 7| information about the medications that he takes, any 8| changes, any new — you know, new information as to 9| treatment, whatever. Usually they return with not just 10| a consult sheet but a W-10 form. He didn't have that. 11| But he had two consult sheets. And they are probably 12| amongst these papers. 13| They — and a prescription from the 14| surgeon. I saw that he had a prescription. I saw, you 15| know, what was there. And what was on the consult 16| sheets were references to leaving a pressure bandage on 17| until such-and-such a date and making an appointment, 18| you know, a follow-up appointment with the surgeon. 19| I saw the time and I made the decision. 20| Because it was in the middle of medication pass, I 21| could have, by rights under the union stipulations, 22| called the supervisor to come and handle the situation. 23| Well — well, that's my understanding. That's what I 24| was told. |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 36 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| APPEALS REFEREE NELSON: Go ahead. 2| MS. WHITE: Okay. By a union 3| representative. 4| APPEALS REFEREE NELSON: Okay. 5| MS. WHITE: And she would have admitted 6| this patient and done all the paperwork at that time 7| because I was in the middle of medication pass. You're 8| really not supposed to stop and take the time away from 9| that because it — there's a time constraint. 10| However, because she was not on the 11| floor, knowing that it was, you know, 10 minutes away 12| from — 10, 15 minutes away from 5:00 (Indiscernible) 13| away from the closing of the pharmacy and the doctor's 14| office, that she would — you know, things could — it 15| would — it would be difficult to carry through on the 16| readmission and the process in — you know, in the way 17| that it's supposed to be done. Emergency pharmacy 18| protocol would have to be followed. And, you know, the CT Page 772 19| pharmacy would be closed. And all of these things. 20| So I made a decision to go to the 21| telephone and to do this as quickly as I could and to 22| come back and do my medications, finish the medication 23| pass. 24| So I went to the phone. I called the |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 37 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| pharmacy. I told her I had a prescription, this and 2| that. I believe I called the doctor's office to get 3| the authorization to fax — because she wanted the 4| prescription faxed. I can't swear to this 100 percent 5| and I'll be honest. At the time that I was questioned, 6| I thought, well, I don't — you know, to remember a 7| single day where you — you weren't taking notes on 8| your events of every day. How would I remember one day 9| and the activities of one day specifically on the spot? 10| I was tired. I had worked for a year without a 11| vacation. I was two weeks away from vacation and 12| needed it. 13| So I — anyway, I believe that I called 14| the doctor's office and then faxed — stuck this 15| prescription pad, paper, to a sheet and faxed it. I 16| then, when I received — after that was done and I 17| received a call from the pharmacy saying they received 18| it, I put that paper in the patient's chart. So there 19| was actually the prescription for the Tylox in the 20| chart. But I had not transferred that information to 21| the order sheet. 22| In fact, because of the time and the 23| fact that I needed to go back and do my meds, right or 24| wrong, I didn't write anything at that point in time on |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 38 |
| HEARING RE: DEBRA J. WHITE CT Page 773 | JUNE 20, 2001 |
1| the order sheet. I didn't get to that until 10:30 at 2| night. 3| APPEALS REFEREE NELSON: Okay. 4| MS. WHITE: I knew that I had done thus 5| and such and whatever, went back, finished the 6| medicines, which did run a little bit over that day. 7| And then after that point in time, you know, it — 8| without being allowed back in the unit to look over 9| every chart to find out what in the world happened that 10| day, something might have fallen, distracted me or this 11| or that — usually the time is pretty much eaten up. 12| And then you go to dinner. 13| And then as soon as I come back, because 14| I go to the second dinner, I go right into the second 15| med pass immediately. So the only time left to do this 16| is at the end of the shift. It should have been 17| (Indiscernible) It would have perhaps been best to have 18| been done right away. But when I saw how late it was 19| and that the med pass — already a half an hour had 20| passed by the time I got this information and I needed 21| to recoup my, you know — to get back to the floor, I 22| delayed writing it until 10:30. That — I was rushed 23| because it was med pass time, because I made the 24| decision not to delay by calling the supervisor and |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 39 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| going through the emergency systems. And when I went 2| to write it in the evening — something that's a human 3| error and mistake. 4| Why I didn't write down the Tylox, I 5| don't know. What was I thinking? I don't know. Late, 6| tired. I can't explain why I didn't transfer that one 7| thing. I can explain why I did not note the — the 8| part of the order from the consult sheet which says to 9| make a follow-up appointment with the surgeon; because 10| I did mention that to the supervisor, who asked me 11| about the situation. I told her that I — at this CT Page 774 12| hour, of course, I couldn't make an appointment. And I 13| had put it on the supervisor's sheet to be done for the 14| next day. She — 15| APPEALS REFEREE NELSON: Okay. 16| MS. WHITE: She agreed with that. She 17| said, "That's fine. You have it on the supervisor's 18| sheet to be done and scheduled for tomorrow." So that 19| — that part I did according to what I had been told by 20| a supervisor. 21| APPEALS REFEREE NELSON: Okay. 22| MS. WHITE: When I — about a month 23| after all of this happened and I settled down — and 24| it's a very upsetting situation for me due to some |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 40 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| personal circumstances as well as the obvious one 2| concerning your job and loss of a job and so forth. I 3| called the doctor's office, the physician in charge of 4| the patient, the physician of record. And I talked to 5| him. I asked him if he remembered — I spoke to the 6| receptionist, "Do you remember", you know, this and 7| that. She gave me bits of information that lead me to 8| wonder, you know — lead me to wonder. 9| The doctor said to me when I said, "I 10| thought I called you" and explained — I knew I had 11| spoken to him within the last couple of months of my 12| employment. I know that for certain. I think I heard 13| like that (Indiscernible), that I think he might 14| remember that I did speak to him. And I remember 15| having to apologize for calling him because he's not a 16| doctor who likes to be interrupted in the middle of his 17| work day for things that are not crucial. Okay? So I 18| remember apologizing to him some time in the — whether 19| it was this particular point in time that call was made 20| or I — I seem — I can't remember any other reason why 21| I would call him other than this. 22| So I was reminding him of certain 23| things. And he said, "Well, you probably did call me." 24| He said "I have (Indiscernible) pain medication to the CT Page 775 |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |
| 41 |
| HEARING RE: DEBRA J. WHITE | JUNE 20, 2001 |
1| patient under these circumstances." He said, "But I 2| want you to call the surgeon and, you know, verify that 3| — and I called the surgeon's office. I spoke with 4| somebody in the office. The doctor wasn't — the 5| surgeon wasn't there. She said, "He probably won't 6| remember specifically." I said, "Well, I needed to see 7| the prescription", which I now have been able to see 8| that it is his prescription, piece of paper. The 9| signature is not really clear. But at the end it has 10| E-H, the last two letters of his name. He probably 11| signed it and not an attending. But even if it was an 12| attending who signed it, he would have been in 13| authority over that person and, therefore, be — you 14| know, he would be responsible for that. 15| So, in essence, they said they would 16| stand behind me (Indiscernible). And the prescription 17| was in the chart. It wasn't in the right place. It — 18| as far as this other matter, I had written out my 19| summation on the sheet that you probably cannot read. 20| But since I don't have copies of it, I can't enter it 21| at this point. 22| These situations did happen. In 23| reference to the first one, not giving the Clonapin, 24| all I really know 51 had signed it off. I thought I |
| POST REPORTING SERVICE | HAMDEN, CT (800) 262-4102 |