## ANTHONY F. KING *v.* BOARD OF EDUCATION OF THE TOWN OF WATERTOWN
## (12944)

PETERS, C. J., HEALEY, SHEA, DUPONT and MCKEEVER, JS.

Argued February 5—decision released April 28, 1987

*Peter W. Benner,* for the appellant (defendant).

*Donald J. Deneen,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. On this appeal, the defendant, the board of education of the town of Watertown (board), maintains that the trial court erred in awarding attorney's fees under General Statutes § 10-235[1] to the plaintiff, Anthony F. King, the former superintendent of schools for the town of Watertown. King incurred these fees in an action litigating the enforceability of a contract entered into on November 5, 1980, between King and the board concerning King's resignation as superintendent. We find no error.

The disposition of this appeal requires the exposition of circumstances that have their genesis in an earlier related appeal. *King* v. *Board of Education,* 195 Conn. 90, 486 A.2d 1111 (1985). That case arose as a result of a claim for indemnification, filed pursuant to General Statutes § 10-235 (a), for legal fees and costs

[1] General Statutes § 10-235 provides in relevant part: "(a) Each board of education shall protect and save harmless any member of such board or any teacher or other employee thereof or any member of its supervisory or administrative staff, and the state board of education, the board of governors of higher education, the board of trustees of each state institution and each state agency which employs any teacher, and the managing board of any public school, as defined in section 10-183b, shall protect and save harmless any member of such boards, or any teacher or other employee thereof or any member of its supervisory or administrative staff employed by it, from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or other act resulting in accidental bodily injury to or death of any person, or in accidental damage to or destruction of property, within or without the person, or in accidental damage to or destruction of property, within or without the school building, or any other acts, including but not limited to infringement of any person's civil rights, resulting in any injury, which acts are not wanton, reckless or malicious, provided such teacher, member or employee, at the time of the acts resulting in such injury, damage or destruction, was acting in the discharge of his or her duties or within the scope of employment or under the direction of such board of education . . . ."

incurred by King in a lawsuit brought by the town council of the town of Watertown against the board in which King was joined as a necessary party. *Town Council v. Board of Education,* Superior Court, judicial district of Waterbury, Docket No. 55550 (February 20, 1981) (town council action).[2] There, the trial court concluded that King had not sufficiently alleged a claim under the indemnification statute and granted the motion to strike filed by the board. We found error. *King v. Board of Education,* supra. In reversing the trial court's action in *King,* we said: "We conclude that the legislature intended to make indemnification available to a board of education employee for losses sustained from claims or suits for damages, injunctive relief or both, resulting from any act of the employee performed 'in the discharge of his or her duties or within the scope of employment or under the direction of such board' . . . ." Id., 97. We set aside the judgment and remanded with direction to deny the motion to strike and for further proceedings. Id., 98. On remand, the trial court rendered judgment in favor of King and awarded attorney's fees in the amount of $4499.19 plus interest.

Because King is seeking indemnification for legal expenses arising out of a suit for injunctive relief which resulted from his signing the November 5, 1980 agreement, the only portion of § 10-235 that requires construction on the present appeal is whether King's legal fees were incurred while he "was acting . . . within the scope of employment or under the direction of the board of education."[3] See General Statutes § 10-235.

---

[2] The trial court in the present appeal, *Gill, J.,* took judicial notice of this case. This court can and also has taken judicial notice of this case. See, e.g., *State v. Davis,* 192 Conn. 739, 744 n.2, 474 A.2d 776 (1984); *Brockett v. Jensen,* 154 Conn. 328, 336, 225 A.2d 190 (1966).

The town council action was instituted against the Watertown board of education only.

[3] The board does not question that King, as superintendent of schools, qualified as an employee within the reach of General Statutes § 10-235. In

The trial court concluded that he was so acting. We agree with the trial court.

Our conclusion that King was "acting . . . within the scope of [his] employment" within the reach of § 10-235, while easy to state, requires, in its application, that we examine the factual circumstances that led to the present appeal.[4] While occasionally cases may arise under § 10-235 in which an employee is so clearly within or without the scope of his employment that the question is one of law, in the greater number of cases the decision is a question of fact for the trier.

The memorandum of decision of February 20, 1981, of the trial court, *Hull, J.,* in the town council action, of which the trial court, *Gill, J.,* in the present case took judicial notice, must serve as the starting point for our discussion. That decision states, inter alia: "A basic social problem that rent the fabric of society in Watertown developed out of two actions of the Board beginning with the June, 1980 meeting and finalized at the next two monthly meetings." First, five long-time teachers who were department heads were replaced because they had not complied with statutory certification requirements. Second, at 1:30 a.m. at the June meeting of the board, without that question being on the agenda, William P. Williams, the "popular principal" of the high school was transferred to a junior

*King* v. *Board of Education,* 195 Conn. 90, 97, 486 A.2d 1111 (1985), we determined that the legislature "intended to make indemnification available to a board of education employee for losses sustained from . . . suits for . . . injunctive relief . . . ."

[4] We disagree, for two reasons, with the board's contention that the evidence of the factual circumstances prevailing in Watertown to which the trial court referred and upon which it relied is immaterial to the issue presented under General Statutes § 10-235. First, the determination as to what is within the scope of employment is initially a fact-bound determination. Second, we must take note of this evidence because the board charges that in deciding the issue the trial court below ignored certain evidence.

high school whose principal was in turn transferred to the high school. When these events took place, "all hell broke loose" and the "manner in which the department head matter and particularly the Williams exchange was handled showed insensitivity to citizen reaction and public relations which helped precipitate the present imbroglio." King, who was a highly qualified educator and professional educational administrator, approved the removal of the "uncertified department heads" but recommended against the Williams transfer. King nevertheless became the "focal point of opposition to the Board's actions." "The degree of public anger and resentment against the Board and . . . King rose to an unprecedented high pitch and this continued to disrupt the entire educational process of the town of Watertown."

A citizens' group known as ARROW (Aroused Rabble Rousers of Oakville and Watertown) was the principal opponent of the board. From June, 1980, and thererafter, ARROW was "an extremely active and at times belligerent force in Watertown" and "[i]ts tactics at times seemed threatening to local officials. It had 200 regular members and could turn out 800 or 900 people at a town budget meeting. ARROW and its adherents were so fired up that they almost paralyzed the educational system in Watertown." Board opponents picketed the homes of board members and painted green arrows pointed toward homes of board members. Although nothing illegal was done by members of ARROW, "a very high degree of personal, political and societal tension and animosity was ever present." Because of their resentment against the board, and particularly against the five member group which controlled the board, ARROW and its supporters "effectively blocked" the adoption of the July 1, 1980– June 30, 1981 Watertown annual budget. On August 25, 1980, the town council adopted an interim budget for

the first ninety days of the new fiscal year and on November 25, 1980, adopted a further sixty day interim budget. Both interim appropriations contained "guidelines" promulgated by the town council because of the austerity imposed by the lack of a budget. These "guidelines" were properly made known to the board and were in effect on November 5, 1980.[5]

In June, 1980, and thereafter, the board was "almost irreconcilably split 5-4" on the Williams and department heads matters. The controlling group of five "generally supported" King while "some members of the four man minority had reservations about him." As a result of the "great public uproar," two members of the four member minority of the board solicited the help of Mark Shedd, the then state commissioner of education. Thereafter, Shedd sent Peter Adomeit to Watertown to act as a mediator.[6] Adomeit is an attorney who has mediated "dozens of tense situations through the years . . . ."

Adomeit found a "hopelessly split Board with . . . King a lightning rod for community hostility." As the mediator, he felt that he had three objectives: "(a) to defuse the situation and remove the threat of violence; (b) to protect the interests of the Board; [and] (c) to protect the interests of . . . King's professional advancement." Adomeit determined that it was "imperative" that King resign. He noted that King would have difficulty in securing another position at that time as superintendents are usually hired one year in advance.

---

[5] Judge Hull found that two of these "guidelines" or "expenditure rules" were violated by one paragraph of the November 5, 1980 agreement between the board and King. He also found that there were "sufficient uncommitted funds within the Board's interim budget . . . to fund the agreement."

[6] Peter Adomeit was one of five mediators used by Shedd on a contract basis. He presently teaches law at Western New England College School of Law and formerly taught at the University of Connecticut School of Law.

No claim was ever made that grounds existed to remove King for cause. The five member majority of the board was not willing to attempt to fire King or seek his resignation.[7] It remained willing to give him a new contract until the agreement of November 5, 1980, was reached. The majority of the board felt that it was necessary to provide "a fair financial package" to King if he would resign because "he was largely not responsible for the turmoil and would be suddenly terminated with no immediate employment prospects." The five member majority "was very much concerned about . . . King's family and his financial security." The four member minority agreed to the November 5, 1980 agreement because "it felt that . . . King must go" and it was concerned that if it did not agree with this agreement, "the majority would agree to give . . . King a longer contract than was achieved."

At a special meeting on November 5, 1980, the board unanimously approved an agreement worked out by Adomeit. That agreement included the renewal of King's one year contract and the tender by King of his resignation and the board's acceptance of the same. While the renewal of King's contract and his prompt resignation were arranged so that it might be easier for him to gain other employment, this had "little substance and probably contributed to the public reaction which occurred." The court found, however, that the board had acted in good faith in its approval of the agreement and "was acutely aware of and acted in direct response to the community response over the Board's actions and the widespread community demand that . . . King be ousted."

Although "[f]rom a purely financial viewpoint the agreement was an unusually generous one," there was

---

[7] The members of the board knew that under King's contract, they could, on six months notice, that is, before December 31, 1980, discharge King with no payment.

"much to be said on . . . King's behalf." King "was being forced out for reasons largely not of his doing." A majority of the board "felt that he should be reappointed," that his "reputation would be unfairly tarnished early in his career" and that King "could make a strong claim that he was a mere scapegoat, caught in the crossfire between competing interests."

Thereafter, on December 8, 1980, the town council brought an action against the board to enjoin the implementation of the November 5, 1980 agreement. *Town Council* v. *Board of Education,* supra. The board then moved to dismiss and strike the complaint in that the town council had failed to join King as a party "necessary and indispensable to the granting of the relief requested. . . ." The court then ordered King cited in as a party defendant. "Because he was cited in, [King] found it necessary to retain legal counsel to represent him . . . and, accordingly, incurred expenses for legal fees and other costs related to that action." *King* v. *Board of Education,* supra, 94.

After the remand ordered in *King,* the trial court, *Gill, J.,* conducted an evidentiary hearing at which King and the chairperson of the board on November 5, 1980, testified.[8] The parties agreed to the admission, as an exhibit, of Adomeit's testimony in the town council action which describes in great detail not only the grave problems he found in "deeply divided" Watertown, but his evaluations, negotiations and recommendations leading to the November 5, 1980 agreement.

---

[8] The board in its brief concerning the motivation and reasons for signing the November 5, 1980 agreement, argues that the trial court, *Gill, J.,* ignored certain testimony of King. This argument is rejected for several reasons. First, the trial court's memorandum of decision explicitly recognizes that the board was claiming that, in signing the November 5, 1980 agreement, King acted "solely in an individual capacity and for individual reasons and, therefore, falls outside the parameters of General Statutes Section 10-235." Second, a fair reading of the transcript of King's testimony discloses that the evidence on his motivations and reasons for sign-

In this appeal, we must determine whether in the unusual circumstances of this case the interpretation to be given the "within the scope of employment" language, as used in § 10-235, legally justifies the trial court's award of attorney's fees.

"The fundamental objective of statutory construction is to ascertain and give effect to the apparent intent of the legislature." *State* v. *Kozlowski,* 199 Conn. 667, 673, 509 A.2d 20 (1986); *Hayes* v. *Smith,* 194 Conn. 52, 57, 480 A.2d 425 (1984); see 2A J. Sutherland, Statutory Construction (4th Ed. Sands) § 58.06, p. 723. "As is true in every case involving the construction of a statute, our starting point must be the language employed by the legislature." *Verdon* v. *Transamerica Ins. Co.,* 187 Conn. 363, 366, 446 A.2d 3 (1982); see *Lundy Electronics & Systems, Inc.* v. *Tax Commissioner,* 189 Conn. 690, 695, 458 A.2d 387 (1983). We may also look to the legislative history and the circumstances surrounding the statutory enactment and to legislative practice and policy. *State* v. *Kozlowski,* supra, 673–74. It is of some significance that the legislature did not define the phrase in question. The legislature wisely recognized the difficulty of composing a formula which would clearly demarcate the line between what is and what is not "within the scope of employment" and left each case to its own particular circumstances. See, e.g., 99 C.J.S. 676, Workmen's Compensation § 208. "In construing a statute, common sense must be used, and courts will assume that the legislature intended to

ing the agreement required an evaluation by the trier of the extent to which his signing was based on personal interests and the best interests of the school system. Third, although the trial court's memorandum indicates that it made very few findings of fact, the court file discloses that the board did not seek an articulation of that decision. Practice Book § 4051 (formerly § 3082). Fourth, given the presumption that judicial acts and duties have been duly and regularly performed, there is nothing before us to demonstrate that the trial court ignored the evidence involved. See *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 6, 513 A.2d 1218 (1986).

accomplish a reasonable and rational result." *Stoni* v. *Wasicki,* 179 Conn. 372, 376–77, 426 A.2d 774 (1979). Justice Cardozo once said: "Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be construed, if possible, that absurdity and mischief may be avoided." *In re Rouss,* 221 N.Y. 81, 91, 116 N.E. 782 (1917).

As we explicitly stated in *King,* since the first enactment in 1945 of the statute which has now become § 10-235 (a), "the protection afforded by the statute has been expanded frequently both with respect to the persons covered and the circumstances under which indemnification is available." *King* v. *Board of Education,* supra, 95.[9] In 1973, this statute already protected those covered "from financial loss or expense, including legal fees and costs, if any, arising out of *any* claim, demand, suit or judgment by reason of alleged negligence . . . *or any other acts* . . . provided such . . . employee, at the time of the acts . . . was acting in the discharge of his duties *or* . . . under the direction of such board of education . . . ."[10] (Emphasis added.)

The encompassing "or any other acts" language was added expanding the protection and coverage of § 10-235 (a) in 1972.[11] See Public Acts 1972, No. 201,

---

[9] The legislative history of General Statutes § 10-235 is reviewed in some detail in *King* v. *Board of Education,* 195 Conn. 90, 95–96, 486 A.2d 1111 (1985).

[10] Certainly it does not appear reasonable that the phrase "in the discharge of his duties" of General Statutes § 10-235 is applicable. There is no argument, under the circumstances of this case, that the plaintiff had a *duty* to resign as superintendent of schools.

[11] Public Acts 1972, No. 201, § 1, provides in relevant part: "Section 10-235 of the 1971 supplement to the general statutes is repealed and the following is substituted in lieu thereof: Each board of education shall protect and save harmless any member of such board or any teacher or other employee thereof or any member of its supervisory or administrative staff, and the state board of education, the commission for higher education, the board of trustees of each state institution and each state agency which employs any teacher, and the managing board of any public school, as

§ 1. The phrase "any other acts," albeit in another context and not controlling, has been said to include any act that is "other," which means "in addition to" or "distinct from" those acts already mentioned. See *In re Estate of Freshour,* 177 Kan. 492, 280 P.2d 642 (1955). The word "any" has a diversity of meanings and may be used to indicate "all" or "every" as well as "some" or "one" and its meaning in a given statute depends upon the context and subject matter of the statute. *Donohue* v. *Zoning Board of Appeals,* 155 Conn. 550, 556, 235 A.2d 643 (1967); *New York, N.H. & H. R. Co.* v. *Stevens,* 81 Conn. 16, 21, 69 A. 1052 (1908). If that test is applied, it is apparent here that "any" means "all" or "every." Not only do these words of the 1972 enactment impose no limitation but a 1973 amendment further broadens the scope of the statute by adding the phrase "including but not limited to infringement of any person's civil rights." See Public Acts 1973, No. 73-651, § 1.[12] This amendment under-

defined in section 10-161, shall protect and save harmless any member of such board or commission, or any teacher or other employee thereof or any member of its supervisory or administrative staff employed by it, from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or other act resulting in accidental bodily injury to or death of any person, or in accidental damage to or destruction of property, within or without the school building, OR ANY OTHER ACTS RESULTING IN ANY INJURY, WHICH ACTS ARE NOT WANTON, RECKLESS OR MALICIOUS, provided such teacher, member or employee, at the time of the [accident] ACTS resulting in such injury, damage or destruction, was acting in the discharge of his duties OR within the scope of his employment or under the direction of such board of education, the commission for higher education, board of trustees, state agency, department or managing board."

[12] Public Acts 1973, No. 73-651, § 1, provides in part: "(a) Each board of education shall protect and save harmless any member of such board or any teacher or other employee thereof or any member of its supervisory or administrative staff, and the state board of education, the commission for higher education, the board of trustees of each state institution and each state agency which employs any teacher, and the managing board of any public school, as defined in section 10-161, shall protect and save

scores the broad legislative sweep of the term "any other acts" as it is used in § 10-235.

Further support for our conclusion can be found in the fact that the 1972 amendment also inserted the word "or" after "duties" in that portion of the statute which prior to that time had stated: "provided such . . . employee . . . was acting in the discharge of his duties within the scope of his employment or under the direction of such board of education . . . ." The insertion of the additional disjunctive before "within the scope of his employment," thereby placing that phrase between two disjunctives and separating it from the "acting in the discharge of his duties" phraseology served not only to create another alternative affording § 10-235 protection, but also arguably broadened the scope of employment ground because an employee no longer had to be "acting in the discharge of his duties" *and* "within the scope of his employment." "When changes have been introduced by amendment it is not to be assumed that they are without design." *City of Stamford* v. *Town of Stamford,* 107 Conn. 596, 606, 141 A. 891 (1928); *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 21 n.6, 434 A.2d 293 (1980); 1A J. Sutherland, supra, § 22.30, p. 265. Of course, the presumed change does not go any fur-

harmless any member of such board or commission, or any teacher or other employee thereof or any member of its supervisory or administrative staff employed by it, from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence or other act resulting in accidental bodily injury to or death of any person, or in accidental damage to or destruction of property, within or without the school building, or any other acts, INCLUDING BUT NOT LIMITED TO INFRINGEMENT OF ANY PERSON'S CIVIL RIGHTS, resulting in any injury, which acts are not wanton, reckless or malicious, provided such teacher, member or employee, at the time of the acts resulting in such injury, damage or destruction, was acting in the discharge of his duties or within the scope of his employment or under the direction of such board of education, the commission for higher education, board of trustees, state agency, department or managing board."

ther than that which is expressly declared or necessarily implied. *Robinson* v. *Unemployment Security Board of Review,* supra; *Doe* v. *Institute of Living, Inc.,* 175 Conn. 49, 63, 392 A.2d 491 (1978). In any event, the disjunctive "or" added in 1972 appears to have been intentionally used with its alternative significance and not, carelessly, as conjunctive. *Harris* v. *Egan,* 135 Conn. 102, 105, 60 A.2d 922 (1948). Its use indicates a clear legislative intent of separability. *State* v. *Pascucci,* 164 Conn. 69, 72, 316 A.2d 750 (1972).

Additional support for our conclusion can be found in the interpretation of the phrase "within the scope of employment" in the context of the workers' compensation statute. Although the workers' compensation cases are not controlling on the issue before us, they are, nevertheless, instructive for at least two reasons. First, in those cases, statutory coverage does not require that the compensable injury result when the employee is acting solely or only for the benefit of the employer. See, e.g., *Dombach* v. *Olkon Corporation,* 163 Conn. 216, 302 A.2d 270 (1972); *Marks' Dependents* v. *Grey,* 251 N.Y. 90, 93–94, 167 N.E. 181 (1929) (Cardozo, J.). Second, unlike § 10-235, the workers' compensation statute provides that a personal injury is compensable when it is one "arising out of *and* in the course of [the employee's] employment . . . ." (Emphasis added.) General Statutes § 31-284 (a).[13] The terms "arising out of" and "in the course of" set out a "two-part test" and each

---

[13] General Statutes § 31-284 (a) provides: "An employer shall not be liable to any action for damages on account of personal injury sustained by an employee arising out of and in the course of his employment or on account of death resulting from personal injury so sustained, but an employer shall secure compensation for his employees as follows, except that compensation shall not be paid when the personal injury has been caused by the wilful and serious misconduct of the injured employee or by his intoxication. All rights and claims between employer and employees, or any representatives or dependents of such employees, arising out of personal injury or death sustained in the course of employment as aforesaid are abolished other

must be demonstrated by the claimant. *McNamara* v. *Hamden,* 176 Conn. 547, 550, 398 A.2d 1161 (1979); see *Morin* v. *Lemieux,* 179 Conn. 501, 427 A.2d 397 (1980). As we have noted, § 10-235 sets forth three disjunctive circumstances where attorney's fees may be recoverable, i.e., "in the discharge of [the employee's] duties *or* within the scope of employment *or* under the direction of [the] board of education . . . ." (Emphasis added.) While we have no doubt that "within the scope of his employment" means that the legal injury must be incurred by an employee of a board of education and that the legal injury must be causally connected to that employment; see *Phipps* v. *Niejadlik,* 175 Conn. 424, 399 A.2d 1256 (1978); the three disjunctive bases set out in § 10-235, fairly read, indicate a standard not quite as strict as that for workers' compensation under § 31-284 (a).

The board argues that the trial court erred in its "exclusive reliance on the 'course of employment' standard under the workers' compensation statute" when it more appropriately should have considered "the purpose of § 10-235 to protect employees when acting in their employee capacities." It also maintains that "[n]otwithstanding the fact that King was [s]uperintendent of [s]chools when he signed the severance agreement, he could not have been acting as [s]uperintendent, but as an individual severing his employment relationship with [the board] on terms which were in the agreement only to satisfy [his] personal financial demands." Without any such finding by the trial court and without any request for further articulation, the board asserts that it is admitted that no agreement would have been concluded in the absence of these financial terms. We note,

than rights and claims given by this chapter, provided nothing herein shall prohibit any employee from securing, by agreement with his employer, additional benefits from his employer for such injury or from enforcing such agreement for additional benefits."

to the contrary, that the testimony of King at the remand hearing would have supported a finding, if one had been made, that a satisfactory financial arrangement for him was not the sole reason for his signing the agreement.[14]

The board's argument that King was acting individually and not as superintendent when he signed the November 5, 1980 agreement lacks merit. It is true that the word "superintendent" does not appear along with his signature on this agreement. But it is also true that that very agreement plainly sets out that the board had "voted to renew the contract of [King] as [s]uperintendent of [s]chools in Watertown for the academic year 1981–1982 . . ." and his signing that agreement recited the tender of "his resignation of [his] employment with the Board . . ." and the board's acceptance of that resignation. It is patently unrealistic to argue that the board was dealing with King as an individual when we consider the "tumultuous events facing the

---

[14] During the cross-examination of King at the remand hearing, the following took place:

"Q. Now, you testified in your direct that at sometime, I believe, during October of 1980 you reached a determination that the recommendation of Mr. Adomeit that you resign as superintendent was not something that you were willing to consider, is that—was something that you were willing to consider, is that correct?

"A. I was willing to consider it on the basis that I felt that it would be in the best interest of the school system and my family, yes.

* * *

"Q. Is it fair to say, Mr. King, that you were willing to accept the idea of resignation only if the terms were right from a financial standpoint, is that correct?

"A. No, that is not corrĕct. That was not the only [criteria] for my considering submitting the resignation.

"Q. That wasn't my question. My question is, would you have resigned if the financial terms of the agreement did not satisfy the criteria that you just referred to?

"A. I would have to say the answer to that is no.

"Q. Would not have resigned?

"A. Would not have resigned."

town" with the town "[facing] a true crisis of unprecedented proportions" that brought both the full board and King to enter the agreement of November 5, 1980. When King signed the agreement, he had valuable contractual rights that he was not required to waive. These rights included the remainder of his term under his original contract, as well as a new one year term as superintendent for 1981–1982. Moreover, the execution of this agreement was not, as the board argues, on terms "which were in the agreement only to satisfy King's personal financial demands." What we have already set out and the agreement itself discloses is that the board, and indeed the town of Watertown, also benefited by the agreement.[15]

The causal connection of the agreement to King's status as an employee of the board is obvious. There is no finding that King's motivations in signing the agreement with the board were solely personal; the executed agreement involved benefits to both the board and King and it also involved concessions by both parties. The best interests of the educational system of the town of Watertown and of the town itself in successfully negotiating for the termination of the employer-employee relationship constituted strong links in forging the necessary causal connection in what both parties perceived as a mutual agreement terminating that relationship.

In the town council action, King was not an adversary of the board, but a codefendant and, significantly, not a nominal defendant. Under all the circumstances, the town council action has to be viewed as an attempt

[15] Although the trial court in the prior action ultimately concluded that the agreement had been legally entered into, the memorandum of decision in that action discloses the following: 'The court concludes that the expenditure rules adopted by the Council are beyond its authority and illegal insofar as they apply to the educational budget. . . . The November 5th agreement was legal and not legally in violation of the Town Council's interim budget rules since those rules were illegal and beyond the Council's authority. . . ."

to enjoin the implementation of an agreement between the board and King entered into while King was employed by the board and which the parties, both represented by counsel, negotiated concerning one basic matter—the continuation of the employer-employee relationship. The town council did not prevail and there is no appeal pending in that case. Basically, concerned as the town council was with King's continuing status as superintendent of schools, the November 5, 1980 agreement was effected when King was a board employee and was causally connected with his status as an employee. Because the agreement was significantly connected with his employment, the challenged activity was "within the scope of [King's] employment" as required by § 10-235.[16]

Our conclusion accords with the purpose of § 10-235. In 1972, the statute was amended to include the "or any other acts" language. In addressing this expansive language, proceedings on the Senate floor indicated that this amendment "would include acts which are not wanton, reckless or malicious and would cover more than just accident or negligence [sic] type of action

[16] The board's reliance on *Kearney* v. *Board of Education,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 224794 (December 19, 1979), is misplaced. Initially, *Kearney* and the case before us are completely different factually. In *Kearney,* the plaintiff sought indemnification for his legal expenses under General Statutes § 10-235 after he had successfully defended an action brought against him by the board of education seeking his termination for his disciplining of a student. In the present appeal, the board and King were codefendants and not adversaries, as in *Kearney.* In addition, the *Kearney* court states that the "question posed by the facts of this case is whether the paying of expenses or loss is intended by the statute to cover those paid by the teacher [Kearney] to defend himself against the Board's charges (whether he or it initiates the process) as opposed to a third person's charges." It is thus apparent that *Kearney,* fairly read, at least seems to recognize that § 10-235 can apply when a covered employee incurs such expenses in defending against an action instituted by a third party, which is the posture of the case before us. Its persuasiveness on the issue on the present appeal is, therefore, attenuated by its dissimilarities to the present matter.

brought against them." 15 S. Proc., Pt. 5, 1972 Sess., p. 2280, remarks of Senator James J. Murphy, Jr. We therefore disagree with the board's argument that King's conduct, vis-a-vis his execution of the November 5, 1980 agreement, was not within the scope of his employment and not an act that § 10-235 intended to encompass.

The board also claims that the trial court erroneously awarded King statutory interest under General Statutes § 37-3a.[17] The allowance of interest as an element of damages is primarily an equitable determination within the discretion of the trial court. *Bertozzi* v. *McCarthy*, 164 Conn. 463, 467, 323 A.2d 553 (1973). On this record, we see no reasonable ground upon which to find an abuse of the trial court's discretion.[18]

There is no error.

In this opinion the other justices concurred.

---

[17] General Statutes § 37-3a provides: "RATE RECOVERABLE AS DAMAGES. Except as provided in sections 37-3b and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions or arbitration proceedings under chapter 909, including actions to recover money loaned at a greater rate, as damages for the detention of money after it becomes payable except as otherwise provided with respect to demand obligations in section 42a-3-122 (4) (a). Judgment may be given for the recovery of taxes assessed and paid upon the loan, and the insurance upon the estate mortgaged to secure the loan, whenever the borrower has agreed in writing to pay such taxes or insurance or both. Whenever the maker of any contract is a resident of another state or the mortgage security is located in another state, any obligee or holder of such contract, residing in this state, may lawfully recover any agreed rate of interest or damages on such contract until it is fully performed, not exceeding the legal rate of interest in the state where such contract purports to have been made or such mortgage security is located."

[18] The trial court, *Gill, J.*, refused to award King punitive damages. In its brief, the board argues that the trial court did not explain the "basis" on which it entered its award of interest. Here again, we note that no articulation was sought by the board. See Practice Book § 4051 (formerly § 3082).