[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON APPLICATIONS CONCERNING PHASE III ARBITRATION AWARD
The present action arises out of a catastrophic loss which occurred at the Monsanto Corporation's Chocolate Bayou plant in Alvin, Texas, on January 13, 1992 (the Monsanto loss). The parties to this dispute, Industrial Risk Insurers (IRI) and Hartford Steam Boiler (HSB), are parties to a reinsurance treaty. A dispute arose between the parties concerning whether the Monsanto loss was covered by the reinsurance treaty. The dispute eventually led to a complex series of arbitrations. HSB is presently before this court seeking to confirm the award rendered in the final stage of this arbitration process. IRI seeks an order either vacating or modifying the award at issue.
At the time of the Monsanto loss, HSB provided IRI with reinsurance for boiler and machinery coverage pursuant to a reinsurance treaty between the parties that dated back to 1975. While IRI insured Monsanto for all risks, including but not limited to boiler and machinery losses, HSB reinsured IRI only for specific types of boiler and machinery losses.[1] Only a portion of the coverage IRI afforded to Monsanto, therefore, was reinsured by HSB. IRI and HSB disagreed as to the nature of the Monsanto loss. IRI believed that the Monsanto loss was a boiler and machinery loss which was reinsured. HSB, meanwhile, took the position that it was not a reinsured boiler and machinery loss. Rather, HSB asserted that the loss was covered by IRI, pursuant to the non-reinsured portion of IRI's insurance policy with Monsanto, and by Monsanto's other all risk insurers.[2]
IRI entered into an agreement with Monsanto's all risk insurers later in 1992. Under this agreement, IRI and the all risk insurers would participate in an arbitration to determine whether the loss was covered by the all risk policies or by the boiler and machinery portion of the IRI policy. Although IRI was itself an all risk insurer in addition to its status as boiler and machinery insurer, it agreed exclusively to advocate the boiler and machinery position for the purposes of the arbitration. HSB contested this arrangement, and filed two civil actions in the Hartford Superior Court seeking, inter alia, to enjoin the IRI-all risk arbitration from proceeding.[3]
After HSB had filed the two civil suits, IRI and HSB entered into a written Settlement Agreement in February 1993. Pursuant thereto, HSB would drop its civil actions, and the parties would allow the pending arbitration between IRI and the all risk insurers — referred to in the agreement as the Phase I arbitration — to continue to a final adjudication. After CT Page 4088 Phase I, IRI and HSB would move on to the Phase II arbitration. The Phase II arbitration panel's role was to determine "the identification of the terms and conditions of the reinsurance contract between IRI and HSB." Settlement Agreement, Exhibit 1. Following the Phase II arbitration, the parties would move on to Phase III where "the sole issue to be adjudicated . . . [was] whether any loss which IRI is required to pay as a result of the decision in the Phase I Arbitration is reinsured under the contract of reinsurance as identified by the Phase II Arbitration." Id. The Settlement Agreement defined the Phase III arbitration as "a separate arbitration between HSB and IRI pursuant to ARTICLE 9 of the reinsurance agreement between Factory Insurance Association, IRI's predecessor in interest, and HSB. . . ." Id.
The Phase I arbitration proceeded without HSB's participation.[4] On December 27, 1993 the Phase I panel determined that the Monsanto loss was within the terms of IRI's boiler and machinery coverage. See Phase I Final Award, Exhibit 4. Pursuant to the panel's determination, IRI was liable to Monsanto for $103 million.
HSB and IRI than commenced Phase II, and on May 17, 1996, the Phase II panel rendered its final decision identifying the terms and conditions of the reinsurance agreement between HSB and IRI.[5] Essentially, the Phase II final award provided that the reinsurance treaty was on a "following form" basis, meaning that the terms and conditions of IRI's policy with Monsanto took precedence and controlled over any conflicting terms of the reinsurance agreement.
Before the Phase III arbitration commenced, a dispute arose as to the scope of the arbitrable issues to be determined in the Phase III hearing. Specifically, HSB claimed that it was not bound by the Phase I award and was entitled to a de novo hearing concerning the nature of the Monsanto loss in the Phase III arbitration. When the Phase III panel decided that it would conduct an evidentiary hearing to determine whether HSB was entitled to a de novo hearing, it became apparent that the parties disagreed as to the scope of the Phase III panel's authority to decide the de novo issue. HSB contended that the court, not the Phase III panel, should decide the de novo issue, while IRI argued that the panel could conduct the evidentiary hearing.
Because of this dispute, HSB filed a motion to stay CT Page 4089 arbitration. On February 14, 1997, the court ruled that the Phase III panel, rather than the court, had the authority to decide whether to afford HSB a de novo hearing concerning the nature of the Monsanto loss and whether it would be bound by the Phase I final award. See Hartford Steam Boiler Inspection Ins. Co. v.Industrial Risk Insurers, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. 562970 (February 14, 1997, Aurigemma, J.).
Pursuant to that ruling, the Phase III panel conducted a preliminary hearing to determine whether HSB would be entitled to a de novo hearing in the Phase III arbitration. After the hearing, the Phase III panel agreed with HSB and issued an interim award to that effect: "Having considered the submissions of the parties, including prehearing memoranda, exhibits, testimony of witnesses and arguments of counsel at the preliminary hearing held on March 18 and 19, 1997, and after due deliberation, the majority of the Panel has concluded that respondent [HSB] is not estopped by the Phase I Final Award from taking exception to the loss adjustment made by Industrial Risk Insurers, and that HSB is entitled under Article 9 of the Reinsurance Agreement to a de novo hearing on that issue as part of the Phase III hearing before this Panel." Phase III Interim Award, Exhibit 2. By letter dated September 24, 1997, the Phase III panel clarified its interim award by stating: "The Phase III hearing will involve a de novo determination by the Panel of the underlying facts of the loss and coverage under the policies, with consideration but not binding effect to be given to the Phase I award." Letter from Richard D. Smith, Chairman, Phase III Panel, dated September 24, 1997, Exhibit 12.
The Phase III arbitration hearing was conducted in October 1998. The panel heard testimony from eleven witnesses and received over 400 exhibits. On November 18, 1998, the Phase III panel rendered its unammous award: "The loss that Industrial Risk Insurers (IRI) was required to pay to Monsanto Company is reinsured to the extent of Twenty-Two Million Dollars ($22,000,000) under the reinsurance agreement between IRI and Hartford Steam Boiler (HSB)." Phase III Final Award, Exhibit 3.
HSB filed an application to confirm the Phase III award in this court on November 19, 1998 pursuant to General Statutes § 52-417. IRI subsequently filed an application to modify (and confirm as modified) or vacate the arbitration award pursuant to General Statutes §§ 52-418 and 52-419. IRI CT Page 4090 contends that the parties' submission to the Phase III panel limited the panel's authority to a determination of whether the loss that IRI paid Monsanto was reinsured. In quantifying the amount of loss that was reinsured, IRI argues that the Phase III panel exceeded its authority. Accordingly, IRI requests a modification of the Phase III award eliminating the portion that reads "to the extent of Twenty-Two Million Dollars." Should the court determine that it cannot modify the award pursuant to General Statutes § 52-419 without affecting the merits of the controversy, IRI claims that the award should be vacated. HSB, in contrast, argues that the wording of the issue submitted to the Phase III panel, when read in the context of the parties' Settlement Agreement, clearly granted the Phase III panel the authority to determine and quantify the extent of HSB's reinsurance obligation. As such, HSB requests confirmation of the Phase III award.
On February 17, 1999, this court began hearing oral argument on both IRI's and HSB's applications. Argument was concluded on February 18, 1999. Subsequently, each party filed a post-hearing memorandum dated March 12, 1999.
 DISCUSSION
"Arbitration is a creature of contract and the parties themselves, by the terms of the submission, define the powers of the arbitrators." United States Fidelity Guaranty Co. v.Hutchinson, 244 Conn. 513, 519, 710 A.2d 1343 (1998). "Arbitration is created by a contract between the parties referred to as the agreement of submission. The written submission defines the powers of the arbitrator, and the parties are bound by the limits they have fixed." Cashman v. Sullivan Donegan. P.C., 23 Conn. App. 24, 27, 578 A.2d 167, cert. denied,216 Conn. 821, 581 A.2d 1054 (1990). A party can only be forced to arbitrate those issues which it agrees to submit to the arbitrator. See Scinto v. Sosin, 51 Conn. App. 222, 227,721 A.2d 552 (1998), cert. denied, 247 Conn. 963, ___ A.2d ___ (1999).
Where parties voluntarily have agreed to enter into arbitration, the standard of judicial review of the arbitration panel's award turns in part on whether the submission was "restricted" or "unrestricted." See, e.g., Garrity v. McCaskey,223 Conn. 1, 4, 612 A.2d 742 (1992). "The significance . . . of a determination that an arbitration submission was unrestricted or restricted is not to determine what the arbitrators are obligated CT Page 4091 to do, but to determine the scope of judicial review of what they have done. Put another way, the submission tells the arbitrators what they are obligated to decide. The determination by a court of whether the submission was restricted or unrestricted tells the court what its scope of review is regarding the arbitrators' decision." United States Fidelity Guaranty Co. v. Hutchinson,
supra, 244 Conn. 520. The authority of an arbitrator is restricted only if the agreement contains express language restricting the breadth of issues, reserving explicit rights, or conditioning the award on court review. See Garrity v. McCaskey,
supra, 5; see also New Haven v. AFSCME Council 15, Local 530,9 Conn. App. 396, 399, 519 A.2d 93 (1986), cert. denied,202 Conn. 806, 520 A.2d 1287 (1987) (finding submission was unrestricted where it "did not restrict the arbitrators to a specific standard of proof nor did it contain any other conditions or limits"). "For example, the submission may specify that the remedies are limited to those stated in a particular clause in the contract, or that the law of a particular state is to be used." B. Hodgson L. Parley, Alternate Dispute Resolution in Connecticut's Courts (1998) § 5.3.4, p. 68. If no such qualifications are included within the submission, the submission is unrestricted. SeeGarrity v. McCaskey, supra, 5.
In the present action, the submission does not specify a standard of proof or place other conditions or limits on the Phase III panel's authority to decide the issue submitted. Accordingly, the parties' submission to the Phase III panel was unrestricted. "Under an unrestricted submission, the arbitrators' decision is considered final and binding; thus the courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact." (Internal quotation marks omitted.) United States Fidelity Guaranty Co.v. Hutchinson, supra, 244 Conn. 519. Where a submission is unrestricted, three grounds exist for vacating an award: (1) the award rules on the constitutionality of a statute; (2) the award violates clear public policy; or (3) the award contravenes General Statutes § 52-418. See Garrity v. McCaskey, supra,223 Conn. 6.
IRI argues that the third of these grounds applies. In particular, IRI contends that the Phase III panel, in rendering its final award, violated § 52-418 (a)(4), which provides that the court shall vacate an arbitration award "if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject CT Page 4092 matter submitted was not made."
The court, in determining whether the arbitrators have exceeded their power in contravention of § 52-418 (a)(4), simply must compare the award with the submission. See Caldor,Inc. v. Thornton, 191 Conn. 336, 340, 464 A.2d 785 (1983), aff'd,472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985). "Ordinarily, an award which does not respond to the submission cannot be upheld. . . . It is void to the extent to which it is outside the submission." (Citations omitted.) Local 63, Textile Workers Unionof America. C.I.O. v. Cheney Bros., 141 Conn. 606, 613,109 A.2d 240 (1954), cert. denied, 348 U.S. 959, 75 S.Ct. 449, 450,99 L.Ed. 748 (1955). "Such a limited scope of judicial review is warranted given the fact that the parties voluntarily bargained for the decision of the arbitrator and, as such, the parties are presumed to have assumed the risks and waived objections to that decision." (Internal quotation marks omitted.) United StatesFidelity Guaranty Co. v. Hutchinson, supra, 244 Conn. 513.
The party challenging an arbitration award bears the burden of demonstrating that the award is inconsistent with the submission. See Metropolitan District Commission v. AFSCME,Council 4, Local 184, 237 Conn. 114, 119, 676 A.2d 825 (1996). "In the absence of a showing of a violation of [General Statutes § 52-418], the courts should not interfere with the arbitral decision. . . . In addition, [e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings." (Citation omitted; internal quotation marks omitted.) Id., 118-19; see also, e.g.,Saturn Construction Co. v. Premier Roofing Co., 238 Conn. 293,304, 680 A.2d 1274 (1996) ("Because we favor arbitration as a means of settling private disputes, we undertake judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution."); Steiner v. Middlesex MutualAssurance Co. 44 Conn. App. 415, 425, 689 A.2d 1154 (1997) ("Since the parties consent to arbitration, and have full control over the issues to be arbitrated, a court will make every reasonable presumption in favor of the arbitration award.").
This court's review is thus limited to a comparison of the parties' submission and the Phase III panel's final award. The court's first task, thus, is to determine the scope of the submission. See United States Fidelity Guaranty Co. v.Hutchinson, supra, 244 Conn. 522-23 (ascertaining meaning of CT Page 4093 language in submission prior to deciding whether submission was restricted or unrestricted). If the submission limited the panel to an all or nothing determination of whether the Monsanto loss is reinsured, then because the award provides that only a portion ($22,000,000) of the loss that the Phase I panel determined IRI must pay Monsanto is reinsured, the award would not conform with the submission; the court would then determine, pursuant to General Statutes §§ 52-418 and 52-419, whether the award should be corrected or vacated.
In support of its argument that the Phase III panel's final award fails to conform to the submission, IRI relies upon Local1078 v. Anaconda American Brass Co., 149 Conn. 687, 183 A.2d 623
(1962), in which the Connecticut Supreme Court vacated an arbitration award due to its nonconformity to the submission. The arbitration at issue in Anaconda American Brass Co. arose out of a labor dispute between union employees and their employer. The union claimed that the defendant employer was using non-union foremen for tasks usually performed by union workers, and that this practice violated Article VI, Section 9 of the parties' collective bargaining agreement. Pursuant to the agreement, the parties submitted the following issue to arbitration: "Under the terms of the applicable Collective Bargaining Agreement is the Company's present operating practice . . . in violation of Article VI, Section 9?" Local 1078 v. Anaconda American BrassCo., supra, 149 Conn. 689. The arbitrator rendered the following award: "The Company's present operating practice . . . does not violate Article VI, Section 9 so long as the work involved doesnot occupy the major portion of the foreman's time." (Emphasis added.) Id.
The Supreme Court held that the award went beyond the submission. Id. The court reasoned that submission asked the arbitrator a yes-or-no question, and that "[t]he award, when it stated that the present operating practice "does not violate . . . [the contract] so long as the work involved does not occupy the major portion of the foreman's time,' went beyond the question submitted. The arbitrator not only answered the question submitted but he also defined a course of conduct which could be followed in the future." Id., 690.
Under Anaconda American Brass Co., if the court were to conclude that the parties' submission to the Phase III panel limited the panel to rendering an all-or-nothing final award, then the Phase III panel's final award would not conform to the CT Page 4094 submission and IRI would be entitled to an order vacating or modifying the award. However, while the submission in AnacondaAmerican Brass Co. explicitly limited the issue so as to require a simple affirmative or negative response, the language employed in the submission in the present case is not so clear. The lack of clarity flows from the use of the word "any" in the submission. The Phase III panel was required to decide "whether any loss" was reinsured. This could be interpreted in more than one way. IRI claims that this phrase "whether any loss" must be read to mean that the Phase III panel was limited to deciding whether "the loss, if any," that the Phase I panel determined IRI was responsible for is reinsured by HSB. HSB, in contrast, argues that the same phrase means that the Phase III panel was empowered to determine whether "any of the" loss was reinsured.
The submission here is subject to more than one reasonable interpretation. Accordingly, the submission contains an ambiguity. See, e.g., Stamford Ridgeway Associates v. Board ofRepresentatives, 214 Conn. 407, 428, 572 A.2d 951 (1987) (stating that in the context of statutory interpretation that "[t]he word `any' has a diversity of meanings and may be employed to indicate `all' or `every' as well as `some' or `one.'"); King v. Board ofEducation, 203 Conn. 324, 334, 524 A.2d 1131 (1987) (same);Colonial Penn Ins. Co. v. Bryant, 45 Conn. App. 558, 564,696 A.2d 1267 (1997) (same). Therefore, unless the court determines from other evidence that the submission did limit the Phase III panel's authority in the manner that IRI suggests, the award must be confirmed.
In support of its position, IRI argues that its interpretation of the word "any" flows from the reference in the submission to the Phase I panel's decision. At the time the parties entered into the Settlement Agreement, no final decision had been rendered by the Phase I arbitration panel. IRI claims that "any" was used to reflect this fact, and thus should be read as allowing the Phase III panel to decide if the Monsanto loss is reinsured provided that the Phase I panel determined that the loss was covered by IRI as a boiler and machinery loss. See Transcript of Hearing of February 17, 1999, p. 59-63.
While the interpretation of the submission advocated by IRI is not unreasonable, it fails to consider the language used in the Settlement Agreement as a whole. "To give meaning to contracts, courts interpret the intent of the parties by construing the whole contract and all relevant provisions CT Page 4095 together. . . . In construing contract terms, the court seeks to effectuate the intent of the parties. . . . To ascertain the parties' intent, the courts consider not only the language used in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." Harvey v. Daddona,29 Conn. App. 369, 375, 615 A.2d 177 (1992).
In setting forth the definition of the Phase III arbitration, the Settlement Agreement specifically states that Phase III shall be an arbitration "pursuant to ARTICLE 9 of the reinsurance agreement. . . ." Settlement Agreement, Exhibit 1. Article 9 of the reinsurance agreement governs arbitration between IRI and HSB. Section A of Article 9 provides: "If there is a lack of agreement with respect to the facts or the interpretation of applicable coverage, [IRI] shall proceed to adjust the loss with the Insured. If [HSB] shall take exception to such loss adjustment, it shall be adjudicated by a Boiler and Machinery Sub-Committee of [IRI's] Standing Loss Committee." Reinsurance Agreement, Article 9, Exhibit 11.
It is apparent from the language of Article 9, and the reference thereto contained in the definition of Phase III in the Settlement Agreement, that as part of the agreement between IRI and HSB, HSB maintained its right to take exception to the loss adjustment between IRI and Monsanto upon its completion. If HSB were to exercise this right, the exception to the loss adjustment would be adjudicated via arbitration.
Reading the Settlement Agreement as a whole, it is apparent that the term "loss adjustment" includes the Phase I arbitration. Black's Law Dictionary defines "adjustment" of a loss in the insurance context as "the ascertainment of its amount and the ratable distribution of it among those liable to pay it." Black's Law Dictionary (5th Ed. 1979). In a memorandum of law submitted to this court by IRI in connection with an earlier dispute in this case, IRI described HSB's Article 9 rights under the Settlement Agreement by stating: "Article 9, however, appliesonly after HSB has taken exception to IRI's adjustment of the loss. The all-risk insurers and IRI are now in the process of determining (via the coverage arbitration) whether the loss is covered by the all-risk policies. IRI's participation in the coverage arbitration is consistent with its obligations under Article 9 to "proceed to adjust the loss with the insured.' Pursuant to Article 9, HSB can seek remedy only after the loss CT Page 4096 adjustment is complete, and then only if HSB "shall take exception to such loss adjustment.' If the coverage arbitration determines the loss to be the all-risk [insurers'] liability, HSB will have no reason to take exception to the "loss adjustment and this action will be rendered moot.'" Memorandum in Support of Defendant's Motion to Strike dated January 13, 1993, Exhibit G. As IRI and HSB entered into the Settlement Agreement less than two months after IRI filed this memorandum, it is reasonable to infer that at that time, IRI considered the Phase I arbitration to be part of the loss adjustment. Thus, one seemingly reasonable interpretation of the Settlement Agreement is that Phase I was part of the adjustment of the Monsanto loss. Phase III would then be the forum in which HSB could have any exceptions to Phase I adjudicated pursuant to its Article 9 rights. This is the construction of the Settlement Agreement advanced by HSB.
IRI argues that the reference to Article 9 in the definition of the Phase III arbitration in the Settlement Agreement encompasses only § B of Article 9, which governs the selection and composition of arbitration panels.[6] The Settlement Agreement, however, plainly states that the Phase III arbitration shall be pursuant to Article 9; it does not state that it shall be conducted pursuant to only § B of Article 9. That IRI interprets the Settlement Agreement in this fashion does not render the operative provision ambiguous. See, e.g., Stephanv. Pennsylvania General Ins. Co., 224 Conn. 758, 764,621 A.2d 258 (1993) ("the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous"); see also Levine v.Massey, 232 Conn. 272, 279, 654 A.2d 737 (1995) ("The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity.").
IRI also contends that Article 9 is superseded by the language of the submission, which sets forth the "sole issue" to be determined by the Phase III panel. IRI argues that while Article 9 does grant HSB the right to take exception to the loss adjustment, this right is narrowed by the language of the submission. Put another way, IRI contends that the Phase III panel could hear evidence concerning the nature of the loss pursuant to HSB's Article 9 rights, but the panel could not expand the scope of the issue submitted i.e., whether or not the Monsanto loss was reinsured.
The problem with IRI's argument again is that the language CT Page 4097 used in delineating the "sole issue" can be read in more than one way. In light of the reference to Article 9 in the definition of the Phase III arbitration, the "sole issue" more reasonably can be read as giving the Phase III panel the authority to examine the facts of the Monsanto loss, determine which portion was a boiler and machinery loss, and fix the amount of that boiler and machinery loss that was reinsured by HSB.
It can be inferred from the Phase III panel's final award that it interpreted the submission as giving it the right to determine how much of the Phase I panel's award was reinsured. In her February 14, 1997 decision, Judge Aurigemma held that the Phase III panel, not the court, should decide whether the submission grants HSB the right to a de novo hearing and whether it is bound by the Phase I panel's final determination. SeeHartford Steam Boiler Inspection Ins. Co. v. Industrial RiskInsurers, supra, Superior Court, Docket No. 562970. Although this court ultimately has the task of determining the meaning of the language of the submission, the Phase III panel's decision as to the scope of the issue before it is persuasive and should be given deference to some degree, particularly where, as here, an extensive evidentiary hearing was conducted by the panel in making its determination.[7] Cf. Stratford v. InternationalAssociation of Firefighters. AFL-CIO. Local 998, 248 Conn. 108,122-23 ___ A.2d ___ (1999) (holding that where parties elect to include in an arbitration contract a provision conferring precedential effect upon prior awards under the contract, the interpretation of the provision is a task for the arbitrator and not the court, and further that because an arbitrator's authority is established by contract, the scope of the arbitrator's authority is itself a question of contract interpretation for the arbitrator).
IRI also points to the Phase III proceeding itself as evidence in support of its claim that the Phase III panel exceeded its authority. IRI contends that no evidence was presented at the Phase III arbitration from which the panel could have determined that only $22 million of the loss was reinsured by HSB. This court, however, is not empowered to review the Phase III panel's award for errors of fact or law. It is not for the court to determine how the Phase III panel reached its conclusion as to the amount of the loss that was reinsured. This court's task is simply to determine whether the final award in Phase III conformed to the submission. Even if this court could review the Phase III panel's legal and factual findings, some deference CT Page 4098 should be afforded to the panel's determinations.[8]
In sum, the court is faced with an arbitration submission which, on its face, is unclear. The evidence suggests that there is more than one reasonable interpretation of the language of the submission. While IRI suggests that the Phase III panel was required by the submission to render an all or nothing decision, this is not the only possible interpretation of the language of the submission.
Reading the language of the Settlement Agreement as a whole, including Article 9 which is referenced therein, this court concludes that the most plausible interpretation allows the Phase III panel to revisit the issue decided at Phase I and to quantify the amount for which HSB was liable pursuant to its contract with IRI. Significantly, there is no language in the Settlement Agreement that clearly states that the Phase III panel is bound by the Phase I panel's determination concerning the nature of the Monsanto loss. Nor is there clear language that states that the Phase III panel's award can be no more than a simple "yes" or "no." In light of the clear policy in Connecticut in favor of upholding an arbitrator's award, IRI has failed to produce sufficient evidence for this court to conclude that the Phase III panel's final award is not in conformity with the parties submission thereto.
 CONCLUSION
IRI has not met its burden of proving, pursuant to General Statutes § 52-418, that the Phase III panel exceeded its powers. Accordingly, IRI's application to modify or vacate the panel's final award is denied, and HSB's application to confirm is granted pursuant to General Statutes § 52-417.
David L. Fineberg Superior Court Judge